MARVIN, *appellant*, and BENNETT and others, *respondents*.

Equity will not relieve against a *mistake* in the conveyance of lands, in respect to the *quantity conveyed*, where a deed is executed and delivered by the vendor, and a mortgage given in return to secure the purchase money; unless the proof be clear, direct and positive.

Also to entitle the purchaser to relief in such case, the *quantity*, must have constituted a *condition* of the sale as agreed upon between the parties; it is not enough that it may have operated as an *inducement* to the purchase, in respect to which the purchaser will be deemed to have assumed the risk, unless in relation to it the vendor be chargeable with fraud.

Nor will relief be granted if the purchaser with ordinary vigilance before the completion of the contract, by *viewing* the premises or properly settling the *terms* of the description, might have guarded against the alleged mistake.

APPEAL from Chancery. Marvin filed a bill for relief in reference to a purchase made by him of a tract of land situate in the now city of *Buffalo*, alleging *misrepresentation* on the part of the vendors prior to the sale, as to the quantity of land embraced in the tract. P. Bennett and W. Williams, the owners of the tract, agreed to sell it to A. Marvin, for the sum of twelve thousand dollars, of which sum six thousand dollars was to be secured by bond and mortgage, and for the residue, Marvin was to give two notes of three thousand dollars each. The contract was executed *at Buffalo*, by the giving of the deed, the execution of the mortgage, and the delivery of the notes. The first note was paid at maturity. When the second fell due, Marvin paid one thousand dollars, and gave a note for the balance, viz. two thousand dollars, which was discounted by the Bank of Buffalo, and at maturity was protested for non-payment; and shortly after which event, this bill was filed. The premises are described in the deed from Bennett and Williams to Marvin, in these words: " All that certain piece or parcel of land, situate, lying and being in the said village of Buffalo, dis-

tinguished as follows, viz. : by being block or lot number ninety-eight on said Bennett and Williams' purchase of Ira Blossom, of a part of *outer lot number one* in said village, according to a subdivision of the same into small lots, as laid down on said Bennett and Williams' map, bounded as follows, viz.: beginning on the northerly line of Water-street, at its intersection with the northerly line of Le Couteulx-street, as laid down on said Bennett and Williams' map; thence running northwesterly on the same line of Water-street, to the southeasterly corner of outer lot number two in the said village of Buffalo; thence northeasterly along the southeasterly line of said outer lot number two, to the southwesterly line of Fly-street, as laid down on said map; thence southeasterly on the same line of Fly-street, to its intersection with the northwesterly line of said Le Couteulx-street; thence south-westerly on the same line of Le Couteulx-street to Water-street, the place of beginning, *be the same more or less."* The complainant alleges in the bill, that the vendors *represented* the tract to be in width on *Water-street* 136 feet, and on *Fly-street* 128½; whereas its width, according to the boundaries, is only 119$\frac{4}{100}$ feet, and on Fly-street only 97$\frac{39}{100}$ feet. The defendants in their answer deny such representation. The principal testimony in support of the complainant's allegation is the following: Le Grand Marvin, a son of the complainant, who at the time of the negotiation was a law student in the office of Bennett, one of the vendors, a counsellor of the supreme court of this state, testified that a *map* representing the premises to be 136 feet in width on *Water-street*, and 128½ on *Fly-street*, was referred to by the parties at the time of the negotiation; that he drew the deed of the premises at the request of Bennett, and insisted upon having the width of the tract on Water-street, viz. 136 feet, inserted in the deed; but that Bennett refused to have it done, observing that it would make no difference, provided the boundaries were fixed, whether a greater or less number of feet were speci-

fied, as the deed would carry the whole quantity between the two points, and added he should not be surprised that the lot held out even to 150 feet from Le Couteulx-street to the westerly line of lot number one on Water-street, as the lots conveyed by the Holland Land Company universally overran. The witness still objecting, Bennett told him to draw the deed as he desired it should be done, and they would settle the matter afterwards. On the deed being read to the complainant, he objected to it on the ground that the number of feet were not specified. Bennett then tested the map by a scale, and declared that there were 136 feet; that he had no doubt there were 140, and should not be surprised if there were 150 feet; but there was no necessity of mentioning the number of feet in the deed. The complainant retired and consulted with his son, and expressed his dissatisfaction at Bennett's refusal to have the number of feet inserted in the deed. His son told him that Bennett would be held by his representation, as much so as if they were written in the deed; and they then returned into the office of Bennett, and the deed was executed, and a mortgage given by the complainant and delivered, together with the notes to Bennett. It was proved on the part of the complainant, that the tract according to the boundaries in the deed, did not exceed in width on Water-street, $119\frac{4}{100}$ feet, and on Fly-street $97\frac{39}{100}$ feet; whilst on the part of the defendants, evidence was given tending to show, that according to the original survey of the tract, and the contracts and deeds executed by the Holland Land Company, the original proprietors of the tract, the width of the tract on Water-street would exceed 136 feet. It appeared that great intimacy had long existed between the complainant and Bennett and their families; that Bennett had taken an interest in the welfare of Le Grand Marvin, who aided his father in the negotiation; and that the latter reposed much confidence in Bennett; but on the other hand, it appeared that he was of the mature age of twenty-seven years, and had been actively en-

1841.

Marvin
v.
Bennett.

gaged in land speculations. The complainant alleged that by the diminished area of the tract, its value was reduced at least two thousand dollars below the price he had agreed to pay for it, and prayed for general relief, and for an *injunction*, restraining the defendants from prosecuting a suit commenced on the note for two thousand dollars, and from collecting the bond and mortgage, or assigning the same until the further order of the court. The cause was heard on the pleadings and proofs, by the Hon. ADDISON GARDNER, then vice-chancellor of the eighth circuit, who on the 22d May, 1834, dismissed the bill with costs. The following opinion was delivered by the vice-chancellor:

" The claim to relief in this case is founded exclusively upon the alleged *misrepresentation* of the defendant Bennett, prior to the sale, as to the quantity of land embraced in the lot in controversy. Fraud is not imputed to the defendants. It was not contended that the misrepresentation was intentional; but it was insisted that proof of the misrepresentation *alone* would entitle the complainant to a decree for damages, or to rescind the contract, in the discretion of the court.

There are undoubtedly cases of misrepresentation honestly made, in which this court could and ought to afford relief; but it is, as I apprehend, in those cases only where the false representation lays the foundation for mistake, either in the agreement itself, or the contract, which is the evidence of the agreement.

Where this occurs, the misrepresentation, or rather the mistake, which is the consequence of the misrepresentation, may be rectified, either by rescinding the agreement, or by conforming the written contract to the agreement, according to circumstances.

The case of *Bingham* v. *Bingham*, 1 *Ves. Sen.* 126, falls within the first class of cases to which I have alluded. A purchased an estate of B, which was in fact the estate of A. The sale was rescinded, and B was decreed to repay

the purchase money.  In the case cited, A certainly did
not intend to buy, nor did B intend to sell the land of A.
Strictly speaking, there was no *agreement*, whatever the
*form* of the written contract: and this was very properly
rescinded.

On the other hand, the books are full of cases where the
court has granted relief by amending or giving effect to a
defective conveyance or contract, where the agreement
upon which they were founded is admitted or established
by satisfactory proof.

The question then will be, whether the proofs in this
cause bring this within the principles settled in either class
of the adjudged cases.  In the first place, what was the
true *agreement* between these parties?  The negotiation
was for the sale and purchase of a block of land fronting
on Water-street in the city of Buffalo.  Before the convey-
ance was drawn, it was suggested by the complainant that
the deed should specify that the lot extended one hundred
and forty feet upon Water-street.  This was declined.  It
was then proposed that one hundred and thirty-six feet
should be inserted in the deed.  This also was re-
fused, the defendant insisting that by inserting the metes
and bounds the entire lot would be conveyed.  It will
make no difference, (was the expression of the defend-
ant,) " provided you fix the two points, if there be *more
or less*, it will convey the whole."  And he then pro-
ceeded to assign as a reason why the lot would hold out,
that the land conveyed by the Holland Company univer-
sally overrun.  The complainant persisted in his objec-
tions, and the negotiation was suspended.  An interview
in private took place between him and his son, the witness,
after which the proposition of the defendants was accepted
and the deed executed.  It is impossible to review this
testimony without coming to the conclusion that the *risk*
as to the quantity of the land, constituted one of the ele-
ments of the agreement between the parties, and this fact
will be found to constitute the essential difference between

this case and those which have been cited by the complainant.

The attention of the complainant was distinctly called to this point, and by his agreement he substantially assumed the hazard of the loss in quantity, as he would have been entitled to all the advantage in case the land had exceeded the quantity supposed, and the deed states this agreement truly, according to the intention of the parties. There has been, therefore, no *mistake* of which this court can take cognizance, 3 *Paige* 99. The most that can be said, is, that the complainant has been disappointed. He had the data before him, as well as the opinion and belief of the defendants founded thereon, and honestly expressed, and from these he could and did make his own calculations; and as there has been no fraud or concealment, he must abide the consequences.

The whole bill is framed with a view to relief against a fraud practised by the defendants, not upon the ground of mistake, nor upon that anomalous ground of misrepresentation, without fraud or mistake, in the true sense of that term, as recognized in equity. But even if the bill was properly framed, the merits of the case upon the proofs are decidedly with the defendants, even if the deficiency in the quantity of land were fully established. The evidence upon this point, however, is altogether too doubtful to authorize the rescinding of this contract, even if the complainant was right in the position assumed by his counsel upon the argument. The bill must be dismissed with costs."

In August, 1834, Bennett and Williams filed a bill for the foreclosure of the mortgage, to which Marvin put in an answer, substantially setting up by way of defence the matters alleged in his bill of complaint which had been dismissed. This cause was also heard by the Vice-Chancellor of the eighth circuit, and a decree made by him for foreclosure and sale, 2d November, 1836. Marvin ap-

pealed from both decrees to the CHANCELLOR, who heard both appeals at the same time, and on 25th June, 1840, *affirmed* both decrees. The following opinion was delivered by the Chancellor:

" The whole difficulty in this case relative to the quantity of land in block No. 98, unquestionably arises from the change in the width of Cazenovia Terrace from sixteen to twelve rods; but if that change took place subsequent to the conveyance of outer lot No. 2, to Benjamin Elliott, in April, 1810, it is evident from the testimony of Baldwin, that Marvin will have his full width of one hundred and thirty-six feet on Water-street before he reaches the southeasterly corner of outer lot No. 2, as the same was described and conveyed in the deed of April, 1810. That lot begins, according to the original field notes, at Vollenhoven's Avenue, now Erie-street, in the western bounds of Cazenovia Terrace, and runs south eight degrees west seven chains and fifty-one links, to outer lot No. 1, thence bounding on outer lot No. 1, south fifty-two degrees fifty-five minutes, west twelve chains and thirty links. As this last line is not parallel to Vollenhoven's Avenue, but diverges from it as you proceed towards Water-street, it is evident if you start one chain south of the original west bounds of Cazenovia Terrace, as Baldwin did, at which is now the intersection of Erie-street and the Terrace, and run the courses and distances indicated in the deed of 1810, you will throw the line between outer lots Nos. 1 and 2 further south than the true line between those lots, as they are described in the deeds to Benjamin Elliott and Louis Le Couteulx, and the diagrams annexed to those deeds.

The testimony of Peacock is, that the Terrace, as originally surveyed on the ground, was four chains wide, and that when it was contracted to three chains, the other one chain was considered a part of the outer lots. And if I understand his testimony, this was intended to be a mere enlargement of the outer lots bounding on the Terrace, and was not intended to alter any of the other lines of those lots,

as they were originally run out and marked upon the land. Landon's and Lay's depositions likewise show that the Terrace was originally laid out four chains in width; and they are corroborated by Baldwin's survey, when examined in connection with the diagrams annexed to the deed of 1821, as well as to the original contract of 1806, from the Holland Company to Le Couteulx. By those diagrams, it will be seen that the distance from the Terrace on the short line of lot No. 1, on Cayuga-street, now Pearl-street, is laid down as but two chains, while Baldwin's survey makes the distance from the angle at Pearl and Commercial-streets to the present west line of the Terrace, 188 feet, or about three chains. I think there can be very little doubt, therefore, that the true line between outer lots Nos. 1 and 2, and to which B. Elliot and Louis Le Couteulx were entitled to hold, according to their respective deeds, will give to Marvin his full complement of land between that line and Le Couteulx-street.

In this view of the case, it can hardly be necessary to examine the question whether Marvin was entitled to any relief upon the supposition that his surveyor was right in the location of that line, by taking the present corner of Erie-street and the Terrace as a starting point, instead of the original intersection of the western line of the sixteen rod Terrace with the southerly line of Vollenhoven's Avenue. Upon that subject, however, it may be proper to say, that there is nothing in the case from which any intentional fraud or deception could be imputed to Bennett and Williams, or either of them, even if it had turned out that the width of the lot was not so great as Bennett stated the same to be with reference to the map. From the testimony of Le Grand Marvin, it is evident that his father, as well as himself, was aware of the fact that Bennett did not profess to know the distance upon Water-street between Le Couteulx-street and the line of outer lot number two, as a matter within his own knowledge, which had been ascertained by him by an actual admeasurement;

and as he absolutely refused to have any distance inserted in the deed, but merely to bound the block upon the line of that lot, with the addition of the expression, " be the same more or less," Marvin should have refused to complete the bargain until the line had been actually run out and ascertained, if he did not consent and intend to take the lot by the description contained in the deed itself. Neither is this a case in which the court will give relief to the party upon the ground of a *mutual mistake*. Courts of equity sometimes give relief in cases of mutual mistake, unaccompanied by fraud, when the property which one party intended to sell, and the other intended to buy, did not in fact exist, or where the subject matter of the sale and purchase is so materially variant from what the parties supposed it to be, that the substantial object of the sale and purchase entirely fails. The decision of this court and of the court for the correction of errors in the case of *Roosevelt and Fulton's executors*, 5 *Johns. Ch. R.* 274, 2 *Cowen*, 129, must have proceeded upon that ground, as there was no evidence to sustain an allegation of intentional fraud or misrepresentation in that case. But I am not aware of any case in which a sale of land actually consummated by the giving of a deed and the payment of a part of the purchase money has been rescinded for a mere deficiency in the quantity of the land conveyed, amounting as in this case to less than one-eighth of the quantity of land the purchaser supposed he was buying, admitting he is right in the location of the line of outer lot number two. Where land is sold at a certain price by the acre or foot, and it turns out that by the mutual mistake of the parties, there is considerable deficiency in the quantity, courts of equity have so far interfered in some cases as to relieve the purchaser from the payment of the deficiency; but even in such cases a slight variation in quantity will not afford a ground for the interference of this court to correct the mistake. And where a lot or farm is sold in gross, and conveyed by a deed containing the words " more or less,"

such words being inserted upon deliberation, as in this case, because neither party professed to know the precise quantity contained within the boundaries of the deed, certainly no court ought to interfere to make a new contract for the parties which they did not think proper to make for themselves, except upon clear evidence of fraud or intentional misrepresentation. Here was certainly no mistake in the deed itself, as Bennett distinctly refused to have any distance inserted in the deed, as the length of the line upon Water-street. Marvin, therefore, who was informed of the fact, if he wished to reserve the right to have the mistake corrected in case the distance did not hold out to be as much as Bennett supposed it to be, should, instead of adopting a secret resolution to take the deed as it was drawn, and to hold Bennett to his statement as to the quantity, have communicated that resolution to Bennett, and have required of him a written stipulation to that effect. Upon the whole case, therefore, I think the decision of the Vice-Chancellor was clearly right. His decree in each of these causes must, therefore, be affirmed with costs.

Marvin appealed to this court, where the causes were argued by:

*Le Grand Marvin* and *A. Taber,* for the appellant.

*T. T. Sherwood* and *S. Stevens,* for the respondents.

*The following point (among others) was submitted and argued on the part of the appellant:*

The representations, by one of the vendors, being proved to be false, and a material deficiency established, the complainant has a right to rescind the contract, and receive back his money,—or be relieved from payment for the deficiency. *Hazard* v. *Irwin,* 18 *Pick. R.* 95. *Gillespie* v. *Moon,* 2 *Johns. Ch.* 585. *Roosevelt* v. *Fulton,* 2 *Cowen,* 129. 5 *Johns. Ch.* 585. *Machir* v. *McDowall,* 4 *Bibb,* (*Kent R.*) 473. *Champion* v. *White,* 5 *Cowen,* 509.

*Glassel* v. *Thomas,* 4 *Bibb,* 113. *Glover* v. *Smith,* 1 *Dessasaure,* 433. *Jackson ex dem. Cadwell* v. *King & King,* 4 *Cowen,* 207. *Butler et al.* v. *Haskell,* 4 *Dessasaure,* 651. *Fisher* v. *May's heirs,* 2 *Bibb,* (*Kent R.*) 448. *Pearson* v. *Morgan,* 3 *Brown, C. c.* 388. *Hobbs* v. *Norton,* 1 *Vernon,* 136. *Seymour* v. *Delancy,* 3 *Cowen,* 445. 6 *Johns. Ch. R.* 222. 2 *Bibb,* 270. *Jackson ex dem. Goodrich et al.* v. *Ogden et al.* 7 *Johns. R.* 238. *Houghton* v. *Lynch,* 2 *Johns. Ch. R.* 209.

1841.

Marvin
*v.*
Bennett.

*Points submitted and argued on the part of the respondents :*

I. The appellant has wholly failed to show that the lot conveyed to him by the respondents does not contain the number of feet on Water-street which he alleges the respondents represented it to contain, to wit: 136 feet; but on the contrary, it is demonstrable from the evidence that its extent on Water-street is more than 136 feet.

II. But if the plat or block of land in question did not contain 136 feet on Water-street, the appellant has entirely failed to show any such representations on the part of the respondents as would entitle him to the relief sought by his bill.

III. The son, agent and adviser of the appellant, in the purchase of the lot in question, knew all the facts relative to the extent of the lot that the respondents did—the appellant had the same means of knowledge that the respondents had, and both the appellant and his agent were informed by Mr. Bennett of the ground of his opinion and belief as to the extent of the lot. They both knew that he refused to insert any covenant or statement in the deed by which he should be considered as warranting the extent of the lot on Water-street. The appellant saw fit, under those circumstances, to purchase and take his deed without having the lot surveyed, and without requiring any covenant as to its extent, and consequently is not entitled to relief.

After advisement, the following opinions were delivered:

Mr. *Justice* COWEN observed, that fraud was not alleged in the bill; and if any thing, this was a case of *mistake.* The proof tends to show a mistake; but it is not sufficient to authorize the rescindment of the contract. The maxim, *potior est conditio defendentis* applies, and, unless a mistake is clearly shown, there is no relief. To create doubt is not enough to entitle the party complaining of a mistake in a contract to be heard by a court of chancery. The vendor when desired to warrant the quantity or number of feet contained in the tract, declined to do so, and yet the purchaser accepted the deed in the terms in which it had been drawn up. Under these circumstances he virtually abandoned his claim of a deed for a specific quantity of land. The vendor had represented the width of the tract on Water-street to be 136 feet; but when he subsequently refused to execute a deed, specifying the quantity of feet, he cannot be held answerable as for a false representation. The allegations in the bill are not sustained, and the decree of the Chancellor ought to be affirmed.

*By Senator* VERPLANCK. An agreement for the purchase and sale of vacant lots in the city of Buffalo, is consummated by the delivery and acceptance of a deed of conveyance and a mortgage for the purchase money. In both these instruments, the land conveyed is described by its external boundary lines, without mention of their length, or of the area they enclose, and with the addition of the words, "be the same more or less." In these suits, the complainant seeks to rescind the sale, or to obtain other equitable relief, upon the alleged ground of a material deficiency (about one-sixth,) in the extent of the land thus conveyed, from the area understood by the buyer, and represented by the seller before the conveyance.

In the answer and proofs, this deficiency is denied to exist; and the Chancellor assents to this view of the facts,

*affirming* mainly, though not exclusively, upon that ground the decision of the vice-chancellor, who laid little stress upon that branch of the controversy. It is maintained by the respondents, and the Chancellor decides, that according to a correct location of the boundaries of the lots and the adjoining lands, with the neighboring street or terrace, (such as the parties claiming under the original grant are entitled to,) the supposed deficiency will disappear, and the area conveyed will agree with the alleged representation and the understanding of the parties. This conclusion seemed to me probable, though that opinion was much staggered by the argument of the appellant's counsel on some points of the proofs of boundary and location. Were however the conclusion much more certain than it seems to my mind, I should be reluctant to rest the decision of these causes upon it, as the case now stands before the court; nor should I wish to examine that question any farther, judicially, than to see whether the complainant has made out a clear and admitted, or at least incontestible case of deficiency. But the fixing the precise location and adjusting the several metes and bounds by our decision, would be to pass indirectly upon the rights of other owners of adjacent lands, who are not before us: since such a location as would give the full extent to the land in question, would also unsettle the lines of other property. We may have but a partial view of the whole case. On a trial at law against or between any of those adjacent owners, other evidence might throw a different light upon the facts now presented. We do not indeed directly pass upon those rights, nor would our adjudication here, preclude farther litigation, nor entitle the vendee to possession against his encroaching neighbors. Yet we may go far to settle the law in future litigations. I should therefore have preferred that if this were of necessity the turning point of the controversy, these other owners should have been made parties. I allow that they are not necessary parties, and that as they are not immediately interested in the event,

there is weighty authority against compelling those who have only subsequent or contingent interests to become parties to a litigation. *Demonhay* v. *Newenham*, 2 *Schoales & Le Froy* 208, *and the cases there cited by Lord Redesdale.* Yet this is an anomalous case, and might authorize the exercise of the large judicial discretion vested in chancery. But at present we are only required to consider this as a question of judicial propriety and expediency. On that ground, I wish to prevent our decision here, on the present state of the evidence, from bearing injuriously in any way upon the rights or interests of persons not before us; since in my view, the circumstances of the case are not such as to require us to pass even indirectly upon the disputed location, and our judgment may be placed upon reasons of much broader application, not less appropriate to the controversy, and of far more importance to the public to be well settled and clearly understood.

Let us briefly consider what reasons would make it just or proper to open a contract for the sale of land, when perfected by the deliberate form of a legal conveyance. The subject is of frequent applicability, and all the chief reasons that have ever been considered sufficient to this purpose in a court of equity, have been insisted upon in the argument before this court, as conclusive in favor of the relief prayed for.

It is the wise and salutary rule of our common law that whenever a bargain has been reduced to writing, this is conclusive as to the parties, and is not to be contradicted by parol evidence. It was considered that there is no small risk that casual talk, hasty or thoughtless declarations, propositions tendered in the course of a negotiation but not finally agreed upon, might be misunderstood or misinterpreted by careless and inattentive hearers, or misrepresented by artifice or fraud. But the deliberate formality of a written instrument affords usually the highest proof of the real terms of the final contract whether executed or executory. If this be true as to a simple article

of agreement, or memorandum of a sale, then a contract of sale of land, ratified and attested by deed formally executed, delivered and received, stands on a still more solid foundation. In law, it is not to be contradicted, and when equity applies its peculiar powers to modify or rescind such an instrument, it is still to be regarded as the very highest presumptive evidence of the real contract, and throws upon the party contesting it, the burden of direct and positive proof of the facts relied upon to invalidate the instrument.

Equity interferes to rescind or correct such deeds by its moral jurisdiction, (in Lord Eldon's phrase,) upon proof of fraud or of total mistake. The several grounds of such relief have been repeatedly stated and adjudicated: as by Lord Chancellor Hardwicke, in the *Earl of Chesterfield* v. *Jansen*, 1 *Ves. R.* 150. They may, without following the very decision and letter, be conveniently reduced to these: 1. Actual deceit, false representation, direct or indirect, made with knowledge of the falsehood: the *dolus malus* of the civil law. Such fraud, it has been held, must be shown by external facts and circumstances, or else made manifest on the face of the transaction, by the nature and subject of the bargain itself; "being such as no man in his senses, and not under delusion, would make on the one hand, and no honest or fair man could accept, on the other." 2. The presumptive fraud arising from the peculiar relation of the parties. The wise jealousy of the law, decrees that the trustee or assignee must not use the advantages afforded by his situation, to buy or sell for his own benefit; that in bargains between parent and child, the father commits a legal fraud if he turns the confidence of his child to his own profit; that the same principle, either as a rule of policy or of presumptive evidence, holds good as to all advantages gained by means necessary confidence, growing immediately out of the legal relations of the parties, as attorney and client, guardian and ward. *Fox* v. *Maccreath*, 2 *Brown C. C.* 400. *Green* v. *Winter*,

1 *Johns. Ch. R.* 27. *Gibson* v. *Jeyes,* 6 *Ves. jr.* 270. *Huguenin* v. *Baseley,* 14 *Vesey* 273. In this last case, the celebrated argument of ROMILY lays down the law with almost judicial authority. In all such cases, the inequality of the parties, and the confidence necessarily reposed by the one in the other, constitute any advantage gained by the stronger at the expense of the weaker, a conclusive presumptive evidence of designed fraud. 3. Mutual mistake, unaccompanied by fraud, or without any proof of it, as when it can be made clear that the mistake or ignorance rendered the written instrument materially variant from that in the intention of the parties. Thus in *Bingham* v. *Bingham,* 1 *Vesey* 126, relief was granted where the complainant had, through ignorance, bought his own estate. Similar relief has been granted by chancery, where it was proved in opposition to a formal written instrument " that this was not the instrument intended to be signed;" that there was some error or omission that made the writing vary essentially from the contemplated bargain. " There is no doubt," said Lord Hardwicke, in a case of this sort, " that this defence ought to be received, and it is quite equal whether it is insisted upon as a mistake or a fraud." *Jaynes* v. *Stalhan,* 4 *Atk.* 397. This court applied the same doctrine in the case of *Roosevelt* v. *Fulton's Ex'rs.* 2 *Cowen* 129, where there was a total failure of the chief and probably sole inducement to the contract, as represented by the seller and relied upon by the buyer, in good faith on both sides.

The Courts have applied these rules more freely, when the fraud or mistake was insisted upon as a defence against a specific performance, than when the object was to set aside an executed contract; but the principles of relief are mainly the same, and the apparent divergence of authority may, I believe, be traced in a great part, to the higher and more conclusive evidence required to overthrow a deliberate and formal instrument, acquiesced in for a time, than

is needed to authorize relief against a bargain or executory contract.

One of the rules found in the books is, that the interference of equity to vacate or alter an executed instrument, is permitted only when it is manifest that had the true state of facts been known such an instrument, on such terms, would not have been executed. To my understanding, the language of the rule still requires farther limitation to express with precision the principle and the spirit of the decisions. If that were the sole limitation, many of the fairest sales might be opened. A distant tract of wild land is sold, neither party knowing its precise character. If it should turn out that there was a valuable mine there, this would present a fact which, if known to the vendor, would have prevented the sale at that price; or the particular acres conveyed, though part of a tract of known fertility, might fall upon an inferior soil. This, too, if known, would have prevented the purchase. To my understanding, the authority of chancery to relieve against executed instruments arises from, and corresponds with its " moral jurisdiction," and is simply the right and consequent duty to protect against the legal consequences of an instrument duly executed, yet in substance and effect such as the party did not mean, or understand himself to execute; whether he was induced to do so by positive mirepresentation or indirect deceit, or by misplaced confidence in his natural or legal guardian, or agent, or by plain mistake. " There is no doubt," said Lord Hardwicke, " that the court has power to relieve in cases of plain mistake in contracts in writing; so that if reduced to writing contrary to the intent of the parties, that may be rectified." *Hinghen* v. *London Ass.* 1 *Ves.* 807. That is the principle; and the rule to be deduced, I take to be, that each party to an agreement is bound to execute it according to the terms on which he knew the other expected him to fulfil it; whilst relief is to be granted against an executed conveyance only when its terms vary essentially from the terms understood

as the conditions of the bargain, not as more probable inducements, of the existence of which the risk was assumed. Positive misrepresentation or trick, or breach of confidence, can render circumstances, which are commonly mere inducements to a bargain, its express or understood condition. The good or bad quality of land, is presumptively one of these risks thus assumed, where no specific representation is made; whilst the quantity of the area of land conveyed by description and boundary, might or might not, according to evidence, be an understood condition, or merely an expectation, of the result of which the buyer assumes the risk. Let us apply these conclusions to the evidence in the cross suits under review.

It can scarcely need authority to prove that the evidence necessary to sustain such an alleged essential variance between the contract intended and that executed, should be strong and convincing. The rational presumption will always be, that the deeds were the conclusive agreements; but the authorities go beyond this. To invalidate such an instrument, said Lord Chancellor Thurlow, "a mistake should be proved as much to the satisfaction of the court as if it were admitted." 1 *Brown C. C.* 94. In another analogous case, the same able Chancellor demanded " irrefragable proof," and his more illustrious predecessor, Lord Hardwicke, insisted that there must be " proper proof, and the strongest proof possible;" and in all these requirements of the highest evidence, our own Chancellor Kent has concurred. *Gillespie* v. *Moore,* 2 *Johns. Ch. R.* 591. If the error be alleged to have been caused by fraud, it is again equally clear that the deceit must be proved against a strong presumption of innocence, in every case except those of special relations of parties, excepted by the strict policy of the law. If the cases before us had fully made out the representations charged, so as to depend wholly upon the fact of the deficiency and its materiality, it must be admitted that the proof is very far short of that unquestionable, or " irrefragable proof which leaves the fact as

1841.

Marvin
v.
Bennett.

undoubted as if it were admitted." For the reasons already stated, I wish to express no positive conclusion as to the facts of location and consequent deficiency. It is sufficient to say, that however the balance of evidence may incline, that question of deficiency is one of argument and inference, and of contradictory locations and surveys. It is not unquestionably ascertained.

Assuming, however, that this deficiency has been established by the last survey, and moreover, shown to be material in extent or value, do the proofs otherwise show conclusively, or even with very high probability, the existence of any of those just and proper causes for the interference of equity against the legal effect of a regularly executed deed and mortgage?

I. Is there convincing proof of actual deceit, by misrepresentation or fraudulent concealment of facts? Clearly not. The whole case shows that the respondents had sufficient reason to believe, from the deeds under which they held, that the fronts and area of the lots were as they appeared on the map, even if we consider that the numbers were placed there by their direction before the sale. The lots were unoccupied and vacant; the sellers had never had a new survey to ascertain the precise extent of their property; whilst their own paper title, together with the conveyances under which the adjoining land is held, from the same original source of title with their own, might naturally lead to the opinion expressed as to the extent. The false representation charged, is not a positive one, but a matter of inference. The property itself, and the evidence of title, during the negotiation with the appellant, were open to the examination and survey of his son, who was his agent and adviser in the transaction. The refusal to insert any specification of extent in the deed, was open and direct; nor is there anything in that idea incompatible with the vendors' belief that their land was of the alleged extent, for which probable reasons were assigned. It is common enough, in sales of unoccupied lands, for the own-

ers to have strong confidence in their legal right to a given extent and boundary, whilst they are yet aware that there may be some boundary question against which they would refuse to warrant. The disputed lines of some of our great land patents in this state, have often furnished evidence of such a state of things. But, in brief: the burden of proof of knowledge of the deficiency, as well as of erroneous representation, is upon the complainant. In order to set aside an executed and received deed, and to impeach his own mortgage on account of legal fraud, he must prove that knowledge and the fraudulent representation conclusively; and this has not been done.

II. It has been suggested in the argument, that though the relation in which the parties stood had somewhat of that confidential character which equity regards as affording conclusive presumption of fraud, where an advantage is gained by its means. This, as has been stated, is a strict rule of judicial policy, intended to prevent the trustee, agent or other person standing in the same confidential relation, from being tempted to betray his duty. It is also a rule of evidence established from the necessity of the case, because, (as Lord Eldon has remarked,) without some such general presumption, when all the evidence is of necessity in the hands or the breast of the trustee, it would be impossible for courts to get at the facts necessary to enable them to relieve the ward, the orphan, or the client, against any iniquity, however monstrous. But this rule of prudent suspicion, must of necessity have narrow limits, and can have no application to a case where the whole relationship consists in the complainant's son, a man of mature age and accustomed to dealing in land, being a law student with one of the vendors. Such an extension of the rule as would give any weight to this consideration, would expose half the sales and agreements made among ordinary acquaintance to vexatious litigation.

III. *Finally:* has there been any error touching the material conditions of the sale, the risk of which has not been

either *directly or impliedly assumed by the vendee?* Where the land conveyed is accessible to the purchaser's examination and survey, without any difficulty, and he neither examines and judges for himself, nor insists upon such description and warranty in his deed, as may protect him, the rational presumption is, that the buyer takes upon himself the risk he does not guard against, either deliberately or else by gross neglect of his own interests. It is for the complainant to rebut that presumption by strong and positive testimony; " By proper proof and the strongest proof possible," say the decisions, " as much to the satisfaction of the court as if it were admitted." Without insisting upon such unquestionable and conclusive evidence, it will still be found that the presumption has not been rebutted by any thing amounting to a probability of the contrary. I agree with the Vice-Chancellor, that the suggestions made by the complainant's son and adviser, that a certain number of feet should be expressed in the deed, the positive refusal of Bennett the vendor, who conducted the business, to do so, assigning at the same time his reason for thinking that there was no deficiency; the continued objection by the purchaser, his conference with his son, and final acceptance of the deed and execution of a corresponding mortgage, both instruments being filled up by the son, are facts showing irresistibly that the risk as to the precise quantity of the land constituted one of the elements of the final bargain. Marvin's attention having been distinctly called to that point, he, in his acceptance of the deed, and execution and delivery of the mortgage took the chance of deficiency, just as he will be entitled to the advantage of any excess, should that turn out to be the fact in consequence of a different location from that made by his surveyor. There may or may not be an important mistake in the buyer's expectation as to the extent of the purchased lots, but there is no proof of any mistake whereby the deed executed varied essentially from the actual final bargain.

The decree should be affirmed.

1841.

Marvin
*v.*
Bennett.

By the President of the Senate. To sustain the appeals in this court, and to entitle the appellant to a reversal of the decrees of the court below, he must show: 1. That there was actually a deficiency in the quantity of land conveyed to him by Bennett and Williams; 2. That Bennett and Williams were bound to convey to him a specified quantity; and 3. That this is such a case as should induce a court of equity to interfere, and relieve the aggrieved party. The appellant, I think, has failed on all these points.

It by no means appears satisfactorily, that there is actually any deficiency whatever in the quantity of land sold and conveyed by Bennett and Williams to Marvin. But admitting that there is such deficiency, it does not appear that Bennett and Williams either did, or were bound to convey to Marvin any specific quantity of land. On the contrary, they sold and conveyed to him a particular block of ground, "be the same more or less;" and when, on the making and execution of the deed, the grantors were requested to have inserted in it specific measures and quantities, that was refused, unless an actual survey were first made; for the grantors had no better knowledge or means of knowledge of the precise measures and quantities of the block of ground in question, than had the purchaser, Marvin, or his agent. The deed, therefore, was made, executed, delivered, and accepted, without containing any covenant for any specific length of lines or quantity of ground, but simply describing and conveying a certain block of ground, " be the same more or less." This deed, therefore, is to be taken and considered as the final contract between the parties, which both and all have entered into voluntarily, deliberately, and understandingly. It should, therefore, be conclusive upon the parties and their rights. This, then, does not present a proper case for such interference of equity as is sought. Here is no fraud established, or mutual mistake of the parties shown, that would not only justify but require the interposition of equity to afford re-

lief.  Such interposition in this case, in the manner pray-
ed, instead of rendering more equitable the present con-
tract between the parties, would be the making of a new
contract for them, which they have neither done, nor
thought proper to do, for themselves.   This the courts be-
low, very properly, have not attempted, but refused.
Their decrees are right, and should be affirmed by this
court.

On the question being put, *Shall the decrees of the Chan-
cellor be reversed?* all the members of the court present at
the argument answered in the *negative.*   Whereupon the
decrees of the Chancellor were unanimously AFFIRMED.