## EAGLE CREEK OIL CO. v. ILLINOIS-OKLAHOMA PETROLEUM CORP.

No. 18613. Opinion Filed Jan. 21, 1930.

Commissioners' Opinion, Division No. 2.

Sandlin & Winans, for plaintiff in error.

H. W. Sitton, W. C. Lewis, and Leon S. Hirsh, for defendant in error.

BENNETT, C. Illinois-Oklahoma Petroleum Corporation, defendant in error here, as plaintiff below, sued Eagle Creek Oil Company, a corporation, plaintiff in error here, defendant below, to recover an oil well and to quiet title to lands thereunder. The well was designated Brown No. 3, and the site of same as well as the place of suit was Stephens county.

Parties will be referred to as they appeared below. Plaintiff alleged that it owned the lease covering south half of southeast quarter of northeast quarter, section 26, township 1 north, range 9 west, Stephens county, Okla., and was in possession of the premises (a copy of the lease and assignment thereof to plaintiff are attached to petition) that defendant has wrongfully withheld said well and has appropriated $54,000 worth of oil from same since May 1, 1925.

Defendant admitted that plaintiff owned the lease, but denied that Brown No. 3 was situate thereon; alleged that it was not intended by the conveyance defendant delivered to Ka-Wye Petroleum Company (plaintiff's grantor) to convey said well; that it was understood that same should remain the property of defendant, of which the plaintiff had notice; that if said well is, in fact, on said lease, there is a mutual mistake in the assignment of same which should be reformed; that Ka-Wye Petroleum Company saw and permitted defendant to take charge of and deepen said well at an expense of $5,000, and that by failure to protest plaintiff became estopped; that if plaintiff recovers, defendant should recover its expenditures.

The reply contained a general denial and an allegation that defendant knew, or by

reasonable care, could have known, the boundaries of the land in controversy; that the section and its measurements were regular, and that the survey made by the government years ago made the location of all subdivisional lines a matter of easy and simple measurement.

The parties waived jury and tried the cause to the court. Judgment went for plaintiff for title and possession of the well, and defendant appeals.

Defendant in its brief urges only two of its nine assignments of error, to wit, Nos. 2 and 3, and presents these together. They are "(2) Said court erred in overruling the demurrer of defendant to the plaintiff's evidence," and "(3) said judgment is not sustained by sufficient evidence, and is contrary to law."

Defendant having abandoned the other assignments of error, we shall pursue the policy of defendant in discussing together these two assignments, since they present but a single issue.

Was the evidence sufficient to support the judgment?

It was stipulated at trial that Robert B. Brown and wife, the owners, on November 7, 1919, executed an oil and gas lease to A. A. Ketchum on the land in dispute. This lease through intermediate assignments passed to defendant, who, on May 25, 1925, assigned same to Ka-Wye Petroleum Company, and thereafter plaintiff became by assignment the owner of said lease.

In 1921, the Eagle Creek Company, being the owner of the lease on the above lands and also on the 20 acres lying just north thereof, drilled a well 2,000 feet in depth near the center lateral line of said tract, encountering only a small showing of gas. The well was not operated and was abandoned as a dry hole. In 1924, certain producing wells were brought in south of this tract, and it became necessary for defendant to drill offsets, and for that purpose it contracted with Ka-Wye Petroleum Company, through its trustee, V. A. Kedney, to drill two offset wells in consideration whereof defendant was to assign to said company the lease on the south 20 acres and pay $250 per acre out of oil. Soon after this contract was fully performed, some difficulty arose between Mr. Kedney, trustee, and the shareholders of the Ka-Wye Company, resulting in the organization of plaintiff company which took over the assets and affairs of Ka-Wye Company. Mr. Kedney acted for a short while as vice president and local manager of the new corporation, but later resigned. Gas was found in the offset wells drilled by the Ka-Wye Company, and soon thereafter the Eagle Creek Company erected a rig over the well which had been originally drilled by it near the center lateral line of the 40-acre tract, and, after deepening same less than 200 feet, found the same productive sand discovered in the offset wells to the south. The well was completed as a considerable producer in May, 1925. Mr. Kedney was in charge of the operation and no legal action was taken to oust the Eagle Creek Company, but it appears that plaintiff was making claim to said well evidenced by sharp correspondence, but soon after his removal from the management of the company in November, 1925, other demands were made for possession of the well upon the ground that same was located on the 20 acres belonging to plaintiff, but the demand was refused and the present action followed.

An abridgment of the evidence follows:

Fred G. McCune, a civil engineer, surveyed the 20-acre tract for plaintiff in November, 1925; that there was a rig situate on line between north and south halves of the 40 acres, and that the old well was south of the median line; part of rig was located on the line; surveyed it again under employment of defendant and again found the well south of the median line.

Witness describes how he arrived at his initial points; located the center of the section north and south and squared up by these; his starting point was an iron stake set by Carter Oil Company, also a stone which bore all indications of having been set by the government and to have remained unmolested. Experienced engineers would accept these points as controlling; that his survey coincided with a survey of same and markers established by Carter Oil Company. Witness surveyed the premises three times and his surveys did not vary one-half inch; that the well was 20 inches south of the line; that he verified the position of iron post by surveying from center of section 28, at which point he found a stone set up by a post; that in one of his surveys he made a slight error, but it would not affect his conclusions that the well lay south of the median line, except to place the well even further south.

A demurrer to plaintiff's evidence, introduced at this point, was overruled.

V. A. Kedney, for defense, testified: Was formerly trustee for Ka-Wye Petroleum Company, a common-law trust, and was one of organizers and an officer of plaintiff; made

trade with Mr. Heck of defendant for the 20-acre tract in 1925; that both understood old well was on north 20 acres; defendant kept possession, neither he nor his company made claim to it; if the well were not on north 20 acres, a mistake was made; he received assignment from defendant in May, but the deal had been closed orally a month before; he agreed to drill two wells on 20 acres and pay $5,000 in oil; that this was done; did not intend to trade for old well; that Mr. McNeill was also an officer of the plaintiff in September, 1925, and was on the lease frequently, and that he made no claim to the well; that witness did not intend to convey the well to plaintiff.

Cross-examination: Discussed purchase of 20 acres with Mr. Heck in spring of 1925; he offered $250 an acre and to drill two offsets; Heck said to divide the 40 acres east and west so as not to take in the old well and witness admitted that to divide the tract north and south would not provide the necessary two offsets on the south end; he had been on the land before the deal; Brown well No. 3 had been long abandoned; the derrick had blown down and that practically none of timbers could be used; no machinery and no boiler there and defendant had never taken any production from the well; he did not think the old hole was on the south 20 acres; that Mr. Heck refused to deal on it.

Witness admitted that, on April 5, 1926, he swore to an affidavit (later identified and put in evidence); he read same before he signed it; that he could not get along with Illinois-Oklahoma stockholders; that he had tried to state the facts even if same appear to be in conflict with his affidavit; that he had been a practicing lawyer at one time.

The following questions and answers appear:

"Q. And you say that Mr. Heck said to you then that he wanted to be sure to retain this old dry hole? A. Both of us understood, or, at least, I did, and I think Mr. Heck did, that it was located too far north to take (be) in the south 20 acres. We didn't discuss it at any length. He just said he couldn't trade on it, that other people in California were interested in it. Q. Didn't discuss whether this hole would be south or north of this line? A. No, sir."

O. C. Heck testified for defendant: Was president of defendant since 1921; made deal with Kedney; discussed whether old well was to go with south 20 acres. Kedney drilled both offset wells before he got an assignment to 20 acres; no one demanded

possession of well until this suit. Witness spent about $7,000 or more in cleaning out and deepening old well; he has a book account of items (but same is not produced). Mr. McCune's survey was erroneous.

Cross-examination: Was absent for two months when Brown well No. 3 was drilled in that year; Mr. Lee made log and reported it to the state; he was an officer of company and had authority to act. Kedney never talked about buying 20 acres from east or west side of 40 acres. Witness said he was not going to convey old dry hole even though he thought it was on north 20 acres and still thinks so; Kedney had drilled two wells costing over $10,000 on a verbal agreement. Witness offered 20 acres to Kedney for $200 per acre, but Kedney said he would do better than that, and would pay $250 per acre; had not been notified that plaintiff claimed well until suit, but when confronted with a letter signed by himself, admitted such notice and his refusal to recognize such claim; also admitted a conversation with Mr. Simmons in which he indicated a knowledge of plaintiff's claim.

Initial production of old well after deepening was 50 barrels of oil daily, and that seven months later it was making from 20 to 25 barrels; sold the oil at $1.60 per barrel; that he needed 25 feet all around the well to operate it; that the machinery set south of the hole.

"Q. Was it a part of your agreement with Mr. Kedney, you had a right to set your engine on our lease to drill your well? A. I wasn't figuring on being on the line."

That Mr. Lee executed assignment to Ka-Wye Company, but did not mention location of dry hole.

On rebuttal plaintiff introduced evidence tending to discredit the veracity of a certain witness offered by defendant.

W. C. Lewis: An attorney, representing plaintiff two years; wrote a letter to defendant in November, 1925, but the exhibit is not in record; he had a conversation with Kedney regarding well and had prepared, from information furnished by him, an affidavit touching deal between Kedney and Heck. Kedney read, amended, and signed the same in witness' presence. In part it reads as follows:

"At the time I purchased the above acreage from the Eagle Creek, this well was known as a dry hole, and not being operated. All the negotiations relative to the purchase of this 20 acres was had between Mr. O. C. Heck of the Eagle Creek Company and my-

self for the Ka-Wye Company. It is my understanding that Mr. Heck claims in the lawsuit that he specifically excepted the well in controversy; that is to say, I agreed with him that the Ka-Wye did not claim this well, and that in the event it was on the lands under lease sold by the Eagle Creek to the Ka-Wye, that the Ka-Wye would not be considered to have purchased the same. In this connection, I desire to state there was no understanding of any kind, either oral or written, either before or subsequent to the execution of the assignment from the Eagle Creek to Ka-Wye, in regard to the well in controversy."

G. B. Wise testified: He was lease man for Kedney and later for plaintiff; talked to Kedney on lease after Eagle Creek deal had been made and before offsets were completed; witness had asked Kedney what he would do with old dry hole if he got production in offset; Kedney replied he intended to rig up and go into the hole with cable tools to drill it deeper; witness had a conversation with Kedney about October 1, 1925, in which he remarked that "as long as he stood on two legs, he was going to fight the company and break it if he could."

There was evidence of notary who took acknowledgment of Mr. Kedney to affidavit; W. F. Coffelt testified he had lived on the land under the Eagle Creek and the Illinois-Oklahoma lease since 1901. He saw the corner stone for the first time in December, 1901; that he picked his quarter from that stone by measurement; lived there continuously from that time; that stone had not been removed when McCune made survey; was present and located iron stake at other corner for McCune; witness had put stake in himself when road was graded through; the stake was put in original place there in case stone should be moved.

There was in evidence a certified copy of well log from files of Corporation Commission. This log was made for Brown well No. 3 by Mr. John Lee, Jr., secretary of defendant, and the location there given was on the center line between north and south 20's. This also is shown by diagram on log where relative position of well is indicated upon a drawing of section 26. This report is verified by John Lee, Jr., representative of the company July 29, 1921.

Plaintiff's exhibit No. 1 is a letter from defendant by O. C. Heck dated November 16, 1925, addressed to plaintiff, in which it is indicated that the writer has knowledge of plaintiff's claim and indicating that the well will be found as much on one side as on the other under proper survey.

Mr. Heck, a witness recalled for plaintiff, testified that John Lee was secretary of defendant and executed assignment of lease to Ka-Wye Petroleum Company and was the man who placed the stake in that location.

The burden rested on plaintiff to show that the well claimed was on its lease. It met this burden by the evidence of civil engineer McCune, who made three surveys of the property, once as an employee of the defendant. These surveys correspond with a variation of only a fraction of an inch. They coincided with a survey made theretofore by Carter Oil Company. Defendant sharply criticises the surveys, but, so far as we can determine from the record, the engineer began at approved government markers and checked and rechecked his work, and there is nothing here which discounts his method or his results. The court is not favored with any evidence from defendant as to correct location of the well.

With the well located on plaintiff's premises, it was entitled to judgment, unless defendant met the burden of establishing his affirmative defense: (1) That the assignment by Eagle Creek Company was made to cover the location of the old well by mutual mistake of the parties, or (2) that plaintiff is estopped because it stood by and permitted defendant to improve the property, and is therefore entitled to the value of the improvements.

Mutual mistake, even against a solemn written contract executed with the formalities of a deed, is a defense easy to plead, but, under our decisions, the proof of it is another matter. It has been held in a suit to reform on this ground, "a preponderance of the evidence is not enough. The proof must establish the facts to a moral certainty, and take the case out of the range of reasonable controversy." Home Ins. Co. v. Akers, 96 Okla. 232, 221 Pac. 493; Cleveland v. Rankin, 48 Okla. 99, 149 Pac. 1131; Burch v. Staples, 70 Okla. 245, 174 Pac. 271; Davis v. Keeche Oil & Gas Co., 89 Okla. 226, 214 Pac. 711.

This court has held:

"But where parties enter into a solemn agreement and reduce that agreement to writing, this agreement, in the absence of fraud, overreaching or mutual mistake, must be upheld and the business of the country, so far as evidenced by written instruments, stabilized, and equity, having regard for the sanctity of agreements, changes them only with reluctance, and requires proof that the written instrument does not express the real contract, and that the error, if any, was occasioned through mutual mistake, and the evidence must be clear, satisfactory, and free from doubt, and show that the party

who seeks reformation was himself free from neglect in the making of the agreement. Heard v. Nancolas (Iowa) 175 N. W. 13."

This seems to be followed substantially in Teachers Conservative Investment Ass'n v. England et al., 115 Okla. 298, 243 Pac. 137.

In none of the authorities is the proof required to change a written contract on this ground held to be sufficient unless it be clear, cogent and convincing. Has defendant met this burden? Was it a mistake? Under the proof, the Eagle Company should have known the location of this well; it drilled same; its secretary-treasurer staked it out, and after it was completed, furnished his report to the state showing its location by measurement and also by diagram. This he was only authorized to do. This same officer executed the transfer to the Ka-Wye Petroleum Company. This officer's evidence was not offered. Why was not the knowledge of this officer as to the site of the well the knowledge of the company? The assignment in question was executed by this officer after the offset wells to the south had been completed and production found. The mistake contended for here is not that an exception clause was inadvertently omitted from the assignment, but concerning an extrinsic fact, that the well was located on the wrong 20 acres. This officer's knowledge tended to negative the existence of a mutual mistake as to the location of the well. But defendant earnestly contends that if the proof shows that Heck and Kedney, who actually made the deal, were mistaken, that should control. Nevertheless, in scanning closely the record, we find Kedney and Heck saying, in effect, "We knew it was close to the boundary line," "we thought it was on the north 20," "assumed it was," "considered it so," etc., but they did not view it, step it, or measure it.

"Q. Did you ever agree with him (Heck) that if it happened to be south of the line, it would be excepted from the transfer? A. No, sir."

It was further testified that the 20 acres were to be paid for and were actualy paid for at $250 per acre in oil, and by the drilling of the offsets, and no deduction in the price or arrangement therefor was made. As against these rather uncertain statements of Heck and Kedney and in contradiction thereof, there is in the record an affidavit by Kedney setting out that it is his understanding that Heck claims in a lawsuit that the well was excepted from, or was not to be included in, the transfer, and the following words are used:

"In this connection, I desire to state there was no understanding of any kind, either oral or written, either before or subsequent to the execution of the assignment from Eagle Creek to Ka-Wye, in regard to the well in controversy."

This affidavit is dated April 5, 1926, and negatives any understanding of any kind as to the location of said well, or its inclusion or exclusion from the terms of the said transfer. This statement was made for the purpose of meeting the claim of the Eagle Creek Company with respect to said well. If this affidavit be true, there was no mutual mistake. We have also the statement of Kedney to his lease man to the effect that, if the offsets found oil, he would rig up the old well for his company. This statement is in direct conflict with Kedney's testimony in the case, but entirely consistent with his statement in the affidavit.

Measuring this evidence by the general rules above enunciated, we conclude that this evidence of defendant, instead of being clear, cogent and convincing, is unclear, contradictory, and unsatisfactory; that instead of alleging and proving that he was the innocent victim of a mistake, the evidence would amply support the finding that defendant was guilty of such negligence as would and should preclude relief to him in a court of equity. Cases supporting refusal of court to interfere in such circumstances are legion. But see Cherokee Oil & Gas Co. v. Lucky Leaf Oil & Gas Co., 116 Okla. 121, 242 Pac. 214; Marvin v. Bennett, 26 Wend. 169; 1 Story's Jur. par. 146. The fundamental basis of these holdings is that parties of full age should use reasonable care to protect themselves. Courts relaxing this requirement encourage culpable negligence and threaten the very foundations of the law relative to written contracts. Grimes v. Sanders, 93 U. S. 55, 23 L. Ed. 798; Green v. Cox Machinery Co., 116 Okla. 255, 244 Pac. 414, and cases cited.

The last contention is that plaintiff was estopped by permitting in silence the defendant to make the improvements disclosed by the record. We think the record does not warrant that conclusion. It is true there is some evidence tending to support the same, but there is also very strong evidence tending to show that defendant had knowledge of plaintiff's rights and claims, and it might even be concluded that the new interest in making such improvements was stimulated largely, if not entirely, by the discovery of oil by plaintiff in the offsets to the south, and that since perhaps defendant thought the well was either on or

very close to the line, that it would take its chance.

At any rate, we are clearly of the opinion, upon consideration of the entire evidence, that the judgment of the trial court is correct and should be affirmed.

It might not be amiss to suggest, even if it should partake of the nature of obiter, that it is more conformable to the theory and purpose of our pleadings to have all pertinent issues, as far as may be, disposed of in a single suit in order that litigation may cease and that defendants may not be harrassed unnecessarily. Plaintiff, by a tactical abandonment of his claim for damages, rents, and profits, perhaps excluded from the issues defendant's claim for improvements. 31 C. J. p. 314; 9 R. C. L. 953, and cases cited; Williamson v. Jones, 43 W. Va. 562, 27 S. E. 411. Defendants do not brief the case under the Occupying Claimants' Act, but, as to this, see Harper v. Stumpff, 84 Okla. 187, 203 Pac. 194; Provens v. Ryan, 57 Okla. 175, 156 Pac. 351.

Upon examination of the position taken by plaintiff in his brief, we think we have a right to assume and have assumed that such abandonment was final, and if so, no harm has been suffered. However, if, in a subsequent proceeding, defendant is called upon to answer in damages, this opinion should not be held to preclude it from asserting its offsets not otherwise foreclosed.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

TEEHEE, JEFFREY, HERR, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (3) anno. 26, A. L. R. 498; 23 R. C. L. p. 368; R. C. L. Perm. Supp. p. 5336. See "Appeal and Error," 4 C. J. §2853, p. 877. n. 80. "Reformation of Instruments," 34 Cyc. p. 984, n. 34; p. 988, n. 37.