## Segur *against* Tingley.

*A, B* and *C,* manufacturers in company, having some disagreement between them, the two former were desirous that the latter should leave the concern ; and upon their application, he consented to sell out his interest, if they could find a purchaser, who would take his place, assume his responsibilities and pay him 50 dollars. *A* thereupon applied to *D,* a farmer, unacquainted with the business, who agreed to purchase the interest of *C* in the concern, if the company debts did not exceed 2000 dollars above their credits. On the 14th of *August,* 1832, *A* and *C* met to ascertain the state of the concern ; two third persons were called in, to assist in the examination ; and *D,* at the request of *A,* was also present. The debts were estimated at from 2200 to 2350 ; the credits, at 275 dollars, without including an unsettled debt from *A* and *B* to the company, supposed to be from 1100 to 1400 dollars. Among the accounts examined, at this time, were those

between the company and *Y* and *Z*, two commission merchants in *Hart-ford*, to whom satinets had been sent for sale. The quantity of satinets, sold and unsold, and their advances and acceptances on account of the company, were stated from the books; and an account of sales at auction in *New-York*, on the 16th of *March* preceding, was exhibited by *C*, as the last account of sales received. These sales were from 43½ to 46½ cents *per* yard, at six months; and from the whole it appeared, that estimating the satinets in the hands of *Y* and *Z* at 45 cents, there would be due from the company to *Y* about 300 dollars, and *Z* would owe the company about the same sum; and therefore, these accounts were not reckoned in estimating the debts and credits of the company. Some of these satinets were sold in *New-York*, previous to the 1st of *September*, 1832, at an average of 40 6.10 cents *per* yard, at six and eight months credit; and the residue, afterwards, at a fraction short of 36 cents. The advances of *Y*, on account of the company, at this time, amounted to 2900. An estimate was also made of the property of the company. At the close of the examination, *D* being satisfied as to the debts and credits, concluded to take *C's* place in the company, and said to *C*, "What do I buy?" *C* replied, "You buy the factory, the machinery, the stock on hand, the satinets in the hands of commission merchants, the *Gallup* contract [referring to a contract with one *Gallup*, supposed to be worth about 50 dollars,] the private debt of *A* and *B* and other debts." *D* thereupon executed an agreement for the purchase of *C's* interest, giving security for the performance of it; took possession of the property; proceeded to collect the credits of the company to the amount of about 100 dollars, the residue (except the individual indebtedness of *A* and *B*) being of little value; to pay or secure the debts due from the company; and to perform the stipulations on his part. The debts due from the company were found greatly to exceed, while their credits fell short of what they were estimated at; the debt to *Y* being 1009 dollars, and the amount due from *Z* being only 21 dollars, owing principally to the fall of satinets in their hands, sold after the date of the account of sales on which the estimate was made. *D* afterwards purchased in the interest of *A* and *B* in the company; which was thereupon dissolved. *A* and *B* are insolvent. On a bill in chancery, brought by *D* against *C*, to be relieved from the agreement, it was held, that no fraud or mistake was inferable from the facts in the case; or if any mistake, the point misconceived was not the cause of the agreement, and had no important influence upon it, and therefore, the court would not set aside the agreement on that ground; consequently, the bill was dismissed.

THIS was a bill in chancery, seeking relief from a certain contract entered into between the plaintiff and the defendant.

The facts stated in the bill and found by the committee, are the following. In *July*, 1832, the defendant and *Nehemiah Daniels* and *James M. Gates* were manufacturers in company, under the firm of *Daniels, Gates & Co.*, at *Willimantic* in this state, and were owners of a mill for the manufacture of satinets, which they purchased of *Gray, Byrne & Smith*, for

2,300 dollars, and gave their individual notes, each for one third part thereof, which now remain unpaid. *Daniels* and *Gates* soon afterwards gave a release deed of their right therein to the defendant; he giving his penal bond to re-convey to them, when they had paid certain debts due from them to *Daniels, Gates* and *Co.* for the assumption of debts made by the former for the latter ; the amount of which was not ascertained, nor could they agree about it.  In consequence of this disagreement, *Daniels* and *Gates* were desirous, that the defendant should leave the concern ; and upon their application, he consented to sell, if they could find a purchaser, who would assume his responsibilities, pay him 50 dollars, and take his place in the company.  *Daniels* thereupon conferred with the plaintiff, a farmer, unacquainted with this business, who agreed to purchase the interest of the defendant, if the debts of the company did not exceed 2000 dollars above their credits ; and on the 14th of *August* following, the defendant and *Daniels* met to ascertain the state of the concern ; and one *Dexter* and *George Byrne* were called in, to assist in the examination. The plaintiff was also requested, by *Daniels*, to be present, so as to know the estimates and calculations made in relation to the debts and credits and property of the concern, then exhibited by the defendant, who was the book-keeper ; the other members of the company having very little knowledge of the company concerns, as they were operatives.  The plaintiff accordingly attended.  Lists of the principal debts and credits, as near as could be ascertained, were made out.  The debts were estimated at from 2,200 to 2,350 dollars.  The amount of the schedule was 2,514 dollars ; but some of the debts were considered doubtful.  The credits, as exhibited in a list thereof, amounted to 275 dollars, 47 cents, not including the debt due from *Daniels* and *Gates*, which, being then unsettled, was supposed to be from 1100 to 1400 dollars, besides some small debts and credits, which, it was supposed, would balance each other.  The accounts of *Pratt, Howe & Co.*, and of *R. Watkinson & Co.*, were particularly examined.  The quantity of satinets sent them, sold and unsold, and their advances and acceptances on account of the company, were stated from the books ; and an account of sales at auction in *New-York*, on the 16th of *March*, 1832, was exhibited, by the defendant, as the last account of sales received.  These sales were from

$43\frac{1}{2}$ cents to $46\frac{1}{2}$ cents *per* yard, at six months. From the whole, it appeared, that estimating the satinets in the hands of *Pratt, Howe & Co.*, and of *R. Watkinson & Co.*, at 45 cents, there would be due from *Daniels, Gates & Co.* to *Pratt, Howe & Co.* about 300 dollars, and *R. Watkinson & Co.* would be indebted to *Daniels, Gates & Co.* in about the same sum; and therefore, these accounts were not reckoned in estimating the debts and credits of *Daniels, Gates & Co.* In making these estimates, no allowance was made on account of interest on acceptances, or the sales being on time. The estimates, however, were considered, at the time, by those who assisted in making them, as fair ones. Some of the satinets were in fact sold in *New-York*, previous to the first of *September*, 1832, at an average of 40 cents, 6 mills, *per* yard, at six or eight months credit; and those sold subsequently, averaged a fraction short of 36 cents.

At the time of this examination, the advances of *Pratt, Howe & Co.*, on account of *Daniels, Gates & Co.*, amounted to 2900 dollars. The goods in their hands, as well as in the hands of *R. Watkinson & Co.*, were held, by them, as commission merchants, subject to the ordinary charges in such cases. The debt due from *Daniels* and *Gates* to the company was then unsettled, but stood on the company books as any other debt, and has since been adjusted, by arbitrators mutually chosen, and found to be 1172 dollars, 89 cents, which was supposed to be partially secured; but there was in fact no security, except the release deed and bond before-mentioned. *Daniels* and *Gates* were then, and still are, insolvent. An estimate was also made of the property of the firm, amounting to 4929 dollars, 40 cents, including the factory purchased of *Gray, Byrne & Smith*, but not including any debts due to the firm, nor a subsisting contract, called the *Gallup* contract, supposed to be worth about 50 dollars.

The day was nearly spent in the investigation, with a view to satisfy the plaintiff; and he being satisfied that the debts above the credits of the company would not exceed 2350 dollars, besides the amount due the defendant for advances more than he had withdrawn from the company, concluded to take the defendant's place in the firm, and said to the defendant, "What do I buy?" The defendant replied, "You buy the factory, the machinery, the stock on hand, the satinets in the

hands of commission merchants, the *Gallup* contract, the *Daniels* and *Gates* debt and other debts." And thereupon the plaintiff made an agreement to purchase all the interest of the defendant in the goods and estate of the late firm of *Daniels, Gates & Co.*; to save the defendant harmless from all debts due to that firm, and from the obligations given to *Gray, Byrne & Smith,* and to give good and sufficient security therefor; to pay the defendant 50 dollars, for his profits in the concern; and also to pay the amount of money, which the defendant had advanced to the firm over and above the amount which he had drawn therefrom; provided the members of that firm should adjust their accounts in an amicable manner, and the debts of the firm over and above their credits should not exceed the sum of 2350 dollars, or about that sum. The defendant, on his part, agreed to quit-claim all his interest in the estate of the late firm, and in their debts, books and papers; and to save the plaintiff harmless from all debts that firm might owe above their credits, exceeding 2300 dollars, or about that sum; and to save him harmless from all foreign debts, except such as should be named in a schedule to be given to the plaintiff. It was also agreed, that the security to be given should be a penal bond in the sum of 3000 dollars, to be executed by the plaintiff and *Alfred Howes* to the defendant; which the plaintiff executed; but *Howes* declining, it was then agreed, that the defendant should convey his interest, by a deed bearing date the 22nd of *October*, 1832, to which should be annexed a condition, that if the plaintiff should save the defendant harmless from the debts due from the company to the amount of 2350 dollars over and above their credits, in the order in which they should be presented for payment, and also the debt due for the factory, then such deed should be valid, otherwise it should become null and void. This was accepted in fulfilment of the contract, by the plaintiff; and in *February* following, *Howes* executed the bond.

On the 5th of *September*, 1832, the defendant executed his bond to the plaintiff in the penal sum of 2000 dollars, conditioned to save the plaintiff harmless from all the debts of said firm above the sum of 2350 dollars and the credits due them, with a bill of sale of all his interest in the satinets, &c. The plaintiff took possession of the property, and proceeded to collect the debts to the amount of 99 dollars, 13 cents. The rest, except

that of *Daniels* and *Gates*, are very small and of little value. The debts due from the firm are found greatly to exceed what they were estimated at ; that to *Pratt, Howe & Co.* being 1008 dollars, 80 cents, occasioned, principally, by the fall of satinets in their hands, sold after the date of the account of sales on which the estimate was made. And the debts due to the firm are much less than estimated ; that of *R. Watkinson & Co.* being but 20 dollars, 70 cents, owing, principally, to the same cause.

Before the commencement of this suit, the plaintiff paid up the debts due from the firm, amounting to 1797 dollars, 59 cents, exclusive of 69 dollars, 53 cents, paid *Daniels*, and 47 dollars, 3 cents, paid *Gates*, under the award of arbitration ; and on the 3d of *November*, 1832, the plaintiff assumed the debt to *Pratt, Howe & Co.*, and gave satisfactory security therefor, (though the members of the old firm were not actually discharged ;) that debt being among the first in order presented for payment.

The plaintiff has paid to the defendant the sum of 50 dollars, according to his contract, and to *Gray, Byrne & Smith*, for the factory, a note of 500 dollars, being the only one due. The defendant has paid of the debts due from the company 1200 dollars, besides what had been paid by the plaintiff. The plaintiff has since purchased the interest of *Daniels* and *Gates* in the factory ; and the co-partnership of *Daniels, Gates & Co.* was dissolved, in 1832. No fraud or mistake is found, unless it can be inferred from the foregoing facts.

The bill and finding were reserved for the advice of this court thereon.

*Goddard*, for the plaintiff, contended, That a court of equity will relieve against a contract, where the condition of the parties, at the time it was made, was unequal, one party being ignorant of the facts and of his rights, and the other perfectly well acquainted with them. *Broome* v. *Beers*, 6 *Conn. Rep.* 198, 211, 12. *Broderick* v. *Broderick*, 1 *P. Wms.* 239. *Jervois* v. *Duke*, 1 *Vern.* 19. *Cann* v. *Cann*, 1 *P. Wms.* 727. *Evans* v. *Llewellyn*, 1 *Bro. Ch. Rep.* 150. 1 *Madd.* 209. *Newl.* 433. 1 *Com. Cont.* 38. *Sug. Vend.* 197, 8. Fraud will be presumed in chancery, where no actual fraud existed, and where a court of law could not infer it. *Trenchard* v. *Wan-*

ley, 2 *P. Wms.* 167. *Garth* v. *Cotton,* 3 *Atk.* 755. And it is no answer that the party deceived might, by due diligence, have prevented it. *Sherwood* v. *Salmon,* 5 *Day* 439. 448.

*Strong* and *Child,* for the defendant, insisted, That the facts in the case furnished no ground for the interposition of a court of equity. There is neither fraud, nor mistake nor accident. Nor do the facts found, either separately or combined, afford an *inference* of fraud. The case is simply this. *Daniels* and *Gates* wished the defendant, *Tingley,* to leave the concern. He consented to sell out, if they could find a purchaser, who would assume his responsibilities, and pay him 50 dollars. *Daniels* found the plaintiff, who said he would come in on those terms, if he could be satisfied that the debts of the company did not exceed their credits beyond a certain amount. The concerns of the company were investigated fully and fairly, in the plaintiff's presence. Among the subjects of investigation, was a quantity of manufactured goods in the hands of commission merchants; and all that the defendant or his partners knew about them, was communicated and correctly stated. The plaintiff then said, "What do I buy?" The defendant replied, "You buy the factory, the machinery, the stock on hand, *the satinets in the hands of commission merchants,*" &c. The plaintiffs thereupon closed the agreement for the purchase of the plaintiff's interest, and took his place in the company. The satinets fell; and the bargain was a bad one for the plaintiff. He bought goods subject to fluctuation; and they depreciated. This is the length and breadth of the case.

WILLIAMS, Ch. J. It is claimed, on the part of the plaintiff, that this contract was entered into, under such circumstances, that he is entitled to relief in a court of equity.

The claim must be founded upon the supposition of *fraud, accident* or *mistake.*

It is not claimed, that there is any *accident,* which is a ground for interposition. The plaintiff must, then, rely either upon *fraud* or *mistake.*

With respect to *fraud,* although it is not expressly negated, by the court, there are no facts from which it can be fairly in-

ferred. The defendant did not even make the application to the plaintiff to buy, or propose to sell to others. His partners, wishing to be rid of him, proposed to him to sell, and he agreed to it, if they would find a *purchaser*, upon his terms. The plaintiff was spoken to, by them, not by the defendant. He acceded to the terms. Other gentlemen were called in with him, to examine the books and the property, and ascertain the debts due from and to the company. The defendant opened to them the books; disclosed the state of the concern, so far as he was acquainted with it; and no one fact is shown tending to prove, that he mis-stated or concealed a single fact, which was known to him. It was, indeed, said, that a sale of goods in *New-York*, made in *March* preceding, was shown; and that a subsequent sale had been made, on the 1st of *September*, at a less price, which the defendant knew of, or might have known of. It is enough to remark, upon this subject, that there was no evidence tending to show, that the defendant had any knowledge of that fact. And the court are called upon to presume, that the knowledge of this sale, must have been communicated to the defendant, before the sale to the plaintiff.

In answer to this, it is to be remarked, in the first place, that fraud is not to be presumed; and in the next place, that the contract between these parties was made on the 14th of *August*, 1832, although the bonds were not signed until *September* following; and there is no evidence that any sale was made after *March* and before *September*, in *New-York*. After the terms of the contract were settled, it is difficult to see how a sale then made should affect the contract, especially, when there was no evidence that the defendant had knowledge of it.

But why should there be any presumption on the subject? The commission merchants resided within thirty miles of the parties; and if they gave any such notice as is claimed, the plaintiff might easily have proved it. There can, then, be no ground to say there was actual fraud, or the concealment of facts important to the plaintiff, which were known to the defendant.

The case must, then, rest upon the ground of *mistake*. This must be either in the amount of debts due from the company, or the amount due to the company, or the estimate of property

on hand, or in relation to the debts due from *Daniels* and *Gates,* and *Daniels, Gates & Co..*

As to the debts due to the company, they were originally estimated at 2,000 dollars ;—at least, not to exceed that sum. But upon more minute examination, the plaintiff actually engaged to become responsible for debts to the amount of 2,350 dollars, and actually took a bond from the defendant to indemnify him, the plaintiff, from all damages, if the debts should exceed that sum. This fact shows, that it was not considered as certain but the company debts might exceed that sum, and also shows, that the plaintiff has provided himself with a remedy at law to secure him against that event.

As to the estimate of the property on hand. The estimate was, that the avails of the goods in *Watkinson's* hands would pay any debts due *Pratt, Howe & Co.* To ascertain this, it was necessary to ascertain what goods were sent to those gentlemen, and then calculate what they would produce. These accounts were particularly examined : the quantity of satinets, sold and unsold, sent to them, and their advances and acceptances were stated from the books, and an account of the last sales exhibited. So far all was fair. They might have sent to *Hartford,* and ascertained a subsequent sale, if there had been any, or got more recent accounts of the state of the market ; but it was not done, and the parties were contented to form their calculations upon the *data* they had. And it seems as fair for the plaintiff, as for the defendant. If the goods rose in the market, the plaintiff received the benefit of it. If they fell, the defendant gained an advantage. In the former case, the defendant could not have claimed any thing from the plaintiff. Why, then, should the plaintiff now claim of the defendant ? No misrepresentation or concealment of facts being shown, the result depended merely upon the state of the market. And on this subject, the court will not undertake to estimate the speculations of parties in a contract, but will deem them the best judges of their own views. *Ward* v. *Webber* & ux. 1 *Wash.* 279.

Then as to the debt due from *Daniels* and *Gates.* It is said, that it was not exhibited as a credit, in the schedule which was exhibited of the debts due to the company ; and yet he was purchasing the credits of the company, and the whole amount

*Windham,*
*July, 1835.*

Segur
*v.*
Tingley.

of credits exhibited was but 275 dollars. That it was known to the plaintiff, that there was an unsettled account with that concern, is perfectly apparent ; because one of the conditions of the contract of the 14th of *August* was, that the defendant and *Daniels* and *Gates* should adjust, in an amicable manner, their company account. And it also appears, that before the business was closed and the bond executed, an arbitration was had, and this adjustment made. As this was one of the conditions the plaintiff had prescribed, he must be presumed to have known, that it was complied with, before he closed the business. He must then, if not before, have known, that this was among the credits of the company. And if he did obtain this knowledge from the defendant, the mode is of little importance.

It is said again, not to be credible, that the plaintiff would be willing to purchase this debt against men who are *insolvent.* What motives influenced the plaintiff's mind, do not appear. He might have had more confidence in these men than others had ; or trusted more in their honour ; or thought better of the security ; or may have thought it important to have the controul of the debt. In the absence of evidence, it is as easy, and certainly it is as charitable, to presume, that he was fairly influenced, as to presume he was led into it, by deception, or even that there was a mistake.

But when it is found, that at the close of the contract, this plaintiff asks *what he buys*, and is expressly informed, among other things, that he buys the *Daniels* and *Gates* debt, as well as the other debts, it is very difficult to believe, that the plaintiff was not fully apprised, that he was to take that debt, though, at the time, the amount might not be ascertained.

It is said also, that it was supposed the debt was *secured ;* and that it was but *partially* secured, or perhaps, there is *no* security. Now, an agreement may be set aside, by reason of a mistake of the parties making it, if the point misconceived, be the cause of the agreement ; (2 *Pow.* on *Cont.* 196.) or perhaps, if it had an important influence upon it. This is not a mistake of that kind. There is no evidence to show how far it was supposed the debt was secured ; or that any attempt was made to ascertain the fact, or any reliance placed upon it. Nor is it even stated in the plaintiff's bill, as a ground of relief, that there was a mistake upon this point. It cannot, therefore, be

*Windham,*
*July, 1835.*

*Segur*
*v.*
*Tingley.*

expected, that the court will set aside this contract, upon that ground.

Upon the most careful examination of the facts, the court do not discover any fraud or misrepresentation on the part of the defendant; nor any mistake on the part of the plaintiff, except mistaken calculations and an unprofitable bargain. He was not taken by surprise; it was not a hurried transaction; on the contrary, time was taken, advice was obtained and a deliberate opinion formed. The first of the writings is dated the 14th of *August*, and the last was not signed until the 22nd of *October*. During all this time, no complaint is heard.

The result is, that there are no facts shown sufficient to warrant the interposition of a court of chancery. The superior court, are, therefore, advised, that the plaintiff's bill ought to be dismissed.

The other Judges were of the same opinion.

Bill to be dismissed.