Miller, J.
This suit was brought to recover the amount of an assessment made upon the defendants, as members of a voluntary association, known as the “Wynant’s Kill Improvement Association,” formed under an act of the legislature of this state, and to compel the defendants specifically to perform the covenants and conditions contained in the articles of association on their part, to be performed by the agreement entered into by them. Both the plaintiffs and the defendants were members of the association, and the plaintiffs’ right to a recovery is based upon the rule that for a breach of an express covenant contained in the articles of partnership, one partner may sue another at law, without praying for a dissolution, or for an account.
Various objections are taken to the plaintiffs’ right to recover, which I will proceed to examine and consider.
It is urged that the copartnership was dissolved before the purchase of the Knowlson farm and lease, on the fourth day of July, 1859.
1. By the sale of the property mentioned in the complaint as “the property of Isaac Merritt, executor &c. of R. P. Hart, deceased,” to other parties.
2. By the change of the • ownership of the property of the Troy Woolen Company, a corporation, and of- the property *241 of the Albia Gotten Factory, and .of the property of the Sand Lake Cotton Factory, and, by the fact that persons owning such properties respectively, or parts of such properties, at the time of the signing of the articles of association, had ceased before said fourth day of July, 1859, to be members of said association.
3. By the defendants, in 1858, withdrawing from the association, when they objected to the purchase of Glass lake and the farming lands connected with it, and refused to pay assessments or to co-operate in its business, and to participate in the proceedings of the association.
First. The sale of the Hart property, and the withdrawal of Merritt the executor, did not effect a dissolution of the association, in my opinion. The articles of association were intended to provide, and I think have sufficiently provided, for such a contingency, so that a change of ownership in property would not dissolve the copartnership and thereby defeat the very purpose and object for which the association was instituted and organized. By the articles it is evident that it was intended that the association should be a continuous and a permanent organization. The only condition upon which any of the associates, whether original or otherwise, were allowed to withdraw and dissolve their connection with the association, was that they had ceased to be owners and occupants of the property in reference to which they had become members. Upon a sale or disposition of their privilege, and upon giving notice to the secretary of that fa¿t, they were discharged from all further liability. Their successors could be substituted in their places, upon signing the articles, and become members of the association, subject to the same liabilities and entitled to the same privileges. The legal effect of this arrangement was no more nor less than a contract entered into between the associates, that notwithstanding the withdrawal of one or more of their number and the substitution of another or others, or not, as might or as might not be done, the organization should continue intact and perfect ip all its *242 parts, so long as its purposes and objects were being carried out and enforced and remained unaccomplished. The articles of association embraced precisely such an agreement, and it was never intended by them that the retirement of a member by the sale of his property should produce a dissolution.
When it is quite apparent that the organization was to continue -until its entire purposes were fully accomplished, and the articles provided for its continuance for a long period of time, as in a case like the present, I am not prepared to assent to the doctrine that it may be dissolved at the will of any one or more of the associates. (See Story on Partnership, §§ 269, 271, 272; 34 Barb. 334.)
Although such a rule would ordinarily apply to copartnerships generally, yet it never has been held applicable to associations like the one in question. In Merrick v. Brainard, (38 Barb. 574,) where by the partnership agreement it was provided that the interests of the partners should be transferrable arid might be transferred at the will of each partner, and that the purchaser should be clothed with all the rights of his vendor, it was held that a transfer of the interest of a partner would work no dissolution, and the purchaser became to all intents and purposes a partner.
There is perhaps some analogy between the case cited and the one at bar, although it is optional here, with the purchaser, to become a member of the association upon signing the articles or not, as he chooses.
I do not think that the authorities cited by the defendants, or the principle before referred to, uphold the doctrine that in a case like this, the will and caprice of a single associate could defeat the very purpose of the organization. It would be contrary' to good faith, and clearly inequitable, to permit the dissolution of an association of this character in a manner so summary.
The association differed in many respects from an ordinary copartnership. Its object was the improvement of the Wynant’s kill stream' by increasing the head of water and *243 regulating the flow thereof for the supply of mills and establishments on said stream by forming reservoirs, &c. and by such other works and improvements as would increase the usefulness of said stream, for milling purposes. Each of the associates was bound to contribute a certain proportion for improvements, in the ratio fixed by individuals named in the articles, for the real estate and property owned by them respectively. The real estate held and acquired was conveyed to trustees upon the trust authorized by the act of the legislature under which the association was organized. The associates thereby became entitled to an interest in the property acquired by the trustees as shareholders of the same, which only ceased upon a conveyance of the mill jirivileges or establishments held by them. The associates were the cestui que trusts for whose benefit the property acquired was held. Through them they held-an interest in the real estate conveyed to the trustees, somewhat different from that of copartners and which I think placed them upon a different footing from that of ordinary members of a copartnership. They could not by a conveyance of their property dissolve the association. Under the provision made for such a contingency, such an act would not be even notice of a desire to dissolve the concern, and would not effect a dissolution.
. Second. Neither did a change in the ownership of the property of three of the associates named, and the fact that they had ceased to be members, produce a dissolution of the association. The purchasers on such sales became members, and became entitled to all the privileges of their predecessors under the articles of the association. They were accepted and recognized by the defendants as such, and I think they are not in a position now to insist that a dissolution was effected in this manner.
Third. The position that the association was dissolved by the withdrawal of the defendants, is sufficiently answered by the remarks made in reference to the first objection. The defendants <?ould only withdraw in the planner prpyided fpr *244 in the articles. This they did not attempt, and have utterly • failed to do. They had no right voluntarily to abandon the association and refuse to perform the duties and obligations imposed upon them, and they could only relieve themselves from the contract they had entered into by a sale of their property.
It is urged that the deed of Glass lake and. the land included therein, and the deeds from Lester and Foster, and of Lester for lands, to pay for the purchase money of which the assessment in question was made were void, because they were executed to “The Trustees of the Wynant's Kill Improvement Association,” and th.eir successors in office, and no persons are named as such trustees, and there is no provision in any of the conveyances or in any declaration of trust, as to the manner in which persons shall be from time to time substituted or designated as trustees,
The act of 1846 provides for both these particulars, and the deeds referred to convey to the trustees of the Wynant's Kill Improvement Association as a body. This is not per- ' haps strictly in accordance with the provision of the first section of the' act, and regarding it in the character of a penal statute, it might be doubtful whether the objection might not be a fatal one, in a case where the deed was directly in question. I am not however aware that any case is reported in which.it has been held that such a conveyance was void and of no effect. The case of Jackson v. Cory, (8 John. 385,) does not uphold such a doctrine. That was an action of ejectment, where the deed was directly in question, being relied upon to sustain the plaintiff's case, and it was held that it was void because it was given to the people of the county, who had no capacity to take by grant; they not being a corporate body known to the law. In the present case the trustees were expressly authorized to take by grant, and it is quite clear that they were intended as the grantees. They are undoubtedly sufficiently named to show who the parties were, and to distinguish them from others, which *245 would seem to be all that is actually essential, (Bac. Ab. title Grant, C,) to entitle the conveyances to the most favorable construction. In Hall v. Leonard, (1 Pick. 27,) it was held that where there are sufficient marks of distinction the grant would be good without any name whatever.
Does the statute so far conflict with the general rule as to make the grant absolutely void and of no effect ? I should have some hesitation in holding thus in a case like this, ¿ where, the controversy does not arise directly with an individual contesting the title of the grantees. I have considerable doubt, also, whether the statute in this respect may not be considered as merely directory, and whether the grantees are not sufficiently named. (Striker v. Kelly, 7 Hill, 9. Marchant v. Langworthy, 6 id. 646.) But it is not necessary to decide that question, as I think the grant may be upheld, so far as the defendants are concerned, upon other grounds.
Conceding that the trustees should have been named, and that in 'this respect, the conveyances are erroneous and not strictly in conformity with the statute; yet the 'object of the conveyances and the trust intended to be created would not thereby fail and become inoperative. Here was a party entirely competent to take a conveyance of the property and to hold and enjoy the same. The consideration money had been fully paid by that party, and under the conveyances possession was taken and held, and the premises were fully occupied and enjoyed. The association was in possession under the conveyances objected to, claiming to own the property for the benefit of those whom they represented, and who were interested as members. They had no authority or right to convey it away, for their own individual benefit, or to appropriate it to their own individual use. The object of the statute was apparent, and that object was substantially accomplished by those conveyances in the form employed. A mere mistake in writing the individual names in the conveyances *246 would not vitiate them. A suit in equity would reform the conveyances and supply this alleged defect.
As against the grantors or their heirs, the deed was perfect ' and complete, and they could not maintain ejectment. As the association was in possession under these conveyances claiming to hold adversely, any conveyance to a subsequent purchaser would be void by statute.
I think, therefore, that the naming of the trustees individually in the deeds was not absolutely essential to enable-the plaintiffs to maintain this action. It is, under the circumstances, sufficient that the association has purchased, paid for, and is in possession of the real estate under conveyances properly executed by the grantors, claiming to hold the property in a manner which would be a defense to any other -person, and is reaping and enjoying the fruits and advantages to be derived from the purchase. It may also be questionable whether the defendants are not debarred •from interposing an objection, which might have been entirely obviated if it had been urged and presented in due season.'
In reference to the remaining objection now considered, it will be observed that the act does not provide that the conveyances should contain a declaration of trust. The articles of association show plainly the character of the .trust intended, and I think the conveyances must be considered and interpreted in connection with the act itself and the articles forming the association, and appointing trustees to carry out the purposes and objects intended.
It is further insisted that the purchase of Glass lake and farm, and other lands from Lester, and from Lester and Foster, -were void because by reason thereof the association acquired real property which made the annual value or income of the property held in trust, exceed the sum of $2000, in violation of the act of 1846. The second .section of the act provides that “ The annual value or income of the property so to be held in trust shall not exceed two thousand dol *247 lars.” The property to be acquired by the act was “real property.”
•There is a distinction between “value” and “income,” when taken separately and alone. Property may have an annual value without any income. As used in the act in question the terms employed may be considered, perhaps, as synonymous. What was intended by these words in the act in question ? Did they mean the annual income of the realty f held in trust ? Did they include the estimated value of the water accumulated, to the mill owners upon the stream? The object of the act was to furnish additional facilities for running the mills and carrying on the milling business upon the stream, and by the restriction, I think, it was not intended to interfere with this object, but to prevent as in many other cases, where special privileges are conferred by legislative enactment, an accumulation of large profits in the hands of tire beneficiaries, which might be detrimental to the public interests or to private rights. The legislature, therefore, said that your privileges, under the act of 1846, shall be so far circumscribed that you shall not receive over $2000, besides what you enjoy, for the same.
This view of the subject is Upheld and sustained by the fact conceded upon the trial, that' the annual income or value of the increased water power, if measured by the rule insisted upon by the defendants, at the time of the passage of the act, was far greater than the sum of $2000 ; thus rendering the act, if such a construction is correct, of no sort of importance and of no avail for the practical purposes intended. The legislature could have intended no such construction, and it would have made the act useless and ineffective, and this should be avoided if possible in construing statutes.
Another suggestion occurs, which is worthy of consideration. The act in question authorized trusts of real property. What was the real- property thus held, within the spirit of the act? Was it the water, the creek or the stream itself? These could not be diverted from their ordinary and accus *248 tomed course. It was "beyond the control of the trustees to restrict their use, or to exact any terms, or make any qualifications for their use among those who were entitled to them. They had no such power or authority—no right to lease the same, or to derive any income therefrom for the benefit of the association. They only held then the land hired or purchased for the purposes of the trust created; with the right to overflow the land when purchased. This gave them only a title to the land and none to, the stream after it had left their dams and flowed on in its ordinary channel.
The association owned the land and the right to overflow, and the simple question is, what was the annual income or value of this ? It reduces itself to the proposition, what was the annual income or value of the land for ordinary purposes, before it was overflowed. Assuming that the right to flow lands by back water is an incorporeal hereditament, as is claimed, (2 Hill, on Real Prop. 125; 8 Blackf. 317. 20 Ohio R. 401; 9 Metc. 462; 4 John. 81, 82,) yet it is difficult to see how the annual value or income of the real property can be said to exceed the sum of two thousand dollars. “Annual value or income,” as used in the act, refers to the association itself, and not to its members individually. I think it does not mean the benefit which each member of it derived from his privilege, but a collective value or income, received by the association as such under the" act in question. It would be exceedingly difficult to estimate or determine the income or value by calculating the increased value of the water privileges to each member. Such a calculation would be involved at least in much intricacy and, it is very clear could not have been contemplated. The value of the water power in the stream was not pertinent to the issue, and could have no bearing upon the question of the annual value or income of the association. The question, it seems to me is, what the association received annually from the privileges and property held by them ? The incidental benefits derived by the assoeiateé'to their mill privileges or in their business, *249 are not within the spirit, meaning or intention of the act. What then was derived from the real property which was held in trust, to the association ? It clearly did not exceed the sum of two thousand dollars.
If the interpretation contended for is correct, the purpose of the act would be entirely frustrated and set at naught. The legislature could not have intended to include in the annual value or income the increased value of the various manufacturing establishments upon the stream which derived an advantage from it; or to estimate the market value of these privileges and calculate interest as the value or income. These items would be exceedingly remote and not embraced within any fair construction of the act. In my opinion they intended to limit the annual value or income to the land obtained, the same as if used for any ordinary purpose, and the objection taken is not available.
I think that the purchase of Glass lake, and the farm connected with it, was legal and valid, and within the scope of the act of 1846. The object of the act was the improvement of the stream by increasing the head of water and regulating the flow'thereof for the supply of the mills and establishments on the stream by the formation of reservoirs, connecting lakes and ponds with the stream, and constructing dams and gates at and below the outlets of such reservoirs, lakes and ponds, and by such other works and improvements as would increase the usefulness of the stream for milling purposes. The great importance of Glass lake as a reservoir was clearly and satisfactorily established by the evidence. The act authorizes “trusts of real property," and provides that the “legal title and estate of any property so held in trust shall be vested in trustees." The purchase of real estate is evidently contemplated by the trust created, and the purpose for which it was authorized. The improvement of the stream by the modes provided, the formation of reservoirs, and the construction of dams and other works and improvements, could not well be accomplished without the purchase of a right to the use of the *250 water at least, which might necessarily involve the purchase of the land itself. Perhaps the one could not be had without the acquisition of the other; and must the work be suspended for that reason ? If land was necessary to aid the association in the improvement of the stream the act authorizes its purchase, and is amply broad enough to cover and sustain such acquisition. The lake was clearly essential for the usefulness and improvement of the stream, and the land connected with it appears to have been equally necessary for the enjoyment of the advantages to- be derived from the lake. If the purchase of Glass lake was important in carrying out and in accomplishing the improvements intended, it does not, in my judgment, vitiate the purchase because in connection with it the purchase included some farming lands. In fact it appears that the association was obliged to purchase the whole in order to obtain what was considered as absolutely indispensable. I think the association ought not on that account to be deprived of the beneficial effect of such a means of improvement. If they had the power to purchase the lake, as it is evident they had, the extent of the purchase of land connected with it must be left somewhat to the exercise of a judicious discretion, and so long as that discretion is not. abused there should be more hesitation in interfering with it. It is quite possible that all the land might not be required in making the improvements contemplated, and it would be difficult to decide, at all times, with entire accuracy and unerring certainty, the exact quantity of land which would be necessary, and which might be required by the overflowing of the waters of the lake, and for other purposes.. If the purchase was made in good faith for the purpose of executing the objects of the association, as I think is manifest, then it should be upheld and sanctioned. While the purchase of farming lands' would be entirely beyond the objects of the trusts created, and would not be necessarily essential to accomplish the improvement of the stream, or to increase the head of water, or to regulate its .flow, yet its incidental connection with a lake, *251 acquired for such a purpose, under the circumstances appearing in the present case, should not be regarded as rendering such a purchase entirely nugatory and of no effect. Because the purchase of the lake involved the purchase of land adjoining the lake, it by no means necessarily follows that the acquisition of the lake involved a violation of the provisions of the act of 1846.
The association determined that this land, a considerable portion of which was swamp land, and very little of it good arable land, was necessary to raise the water higher by a dam above the outlet of Grlass lake. This was a proper object, and within the power conferred by the act, and I think was not foreign to the purposes of the act of 1846, and the object to be attained thereby.
The objection taken, that the assessment is unjust, oppressive and inequitable, is not available. This objection is based upon the ground that the apportionment takes for its basis the principle .that the assessment upon each of the associates should he according to the height of the fall, and not the quantity of water used. There may be some doubt whether the assessment was founded entirely upon this principle, and I am inclined to think it does not distinctly appear that it was. Conceding, however, that it was, can it be of any consequence, when it appears that the defendants, with a full knowledge of - all the facts, agreed to it ? Perhaps they were willing, and it was to their advantage and for their benefit, to assent to more than their proportionate share, rather than be deprived of the improvements contemplated by the association, and actually made by them. Their establishment was large and extensive, and it might well be that in conducting the business arising from it, as it was important that they should have a full supply of water for their mills, they were willing to be liberal beyond their proportionate share in sustaining these improvements. It is not at all times easy to discern and analyze the motives and interests' which induce men to enter into contracts of this charac *252 ter. The great practical advantages to be derived from an enterprise of this kind are often an essential element and. an important consideration, and will sometimes outweigh all other questions, and induce those who represent great interests to make heavy sacrifices, and to assume even unjust proportions and unequal burdens. The plan of assessment seems to have been adopted after due deliberation, and was fully 'approved; and although the defendants may not have used or needed all the water, yet they had a right to its use and enjoyment, under the articles of association. The apportionment made, and the fact that they had not fully exercised this right can scarcely be considered as a defense, when they are called upon to perform and fulfill the conditions of their contract. Even although it may be onerous, yet there is hot, I think, such a change of circumstances as would authorize the interference of a court of equity with the arrangement. Can it be said, with justice and fairness, that the bargain is hard and unconscionable where, at least heretofore, great advantages have flowed from it, and there is no material change in the situation and circumstances of the parties ? I think not. Here was an agreement made upon an adequate consideration and with a full and complete appreciation of its character, and so long as there is no allegation or proof of fraud, or mistake or surprise, I am inclined to the opinion that a court of equity can not hold that it is illegal and inequitable, and for that reason refuse to decree a specific performance. (Will. Eq. Jur. 268. 2 Story’s Eg. Jur. 769.)
If the views expressed upon the point last discussed are sound and correct, then the ruling of the Judge, excluding the testimony of the civil engineers tending to show that the purchases and expenditures, for which’ the assessments were made, did not proportionably advantage the defendants, and that the assessments made for them were unequal and unjust towards the defendants, was correct, and the exception to the decision not well taken.
The objection that the assessment was illegally and irregu *253 larly made is based upon two grounds' (1.) That the property of Merritt, executor, &c. of Hart, which was originally liable under the articles of association, not being represented by an owner who was a member, the scheme of apportionment failed. (2.) That if the defendants are in any manner liable to contribute to the expenditure for the purchase of Glass lake and farm, the present is not the form of action.
First. The withdrawal of members was provided for by the articles of association. It was agreed that parties who might cease to be owners or occupants, should upon written notice given to the secretary, of the fact, be discharged from all further assessments and the person or persons who succeeded such owners or occupants, upon signing the articles should" become a member or members of the association. The effect of this provision, I think, was to impose upon those who remained, after any withdrawal and any neglect of the successor to become a member, the burthen of contributing their due proportion as previously agreed upon to sustain the expenses of the association. It would not necessarily 'follow that the transfer of property by a member of the association without a substitution of a successor would destroy the plan upon which it was organized. Those who remained, unless the number were so far reduced that no benefits would arise from the continuance of the association would still be interested, and liable to contribute in the ratio they had agreed. That ratio was not increased, because one or more members withdrew. Their shares still remained the same, and the remaining associates were bound to contribute in that proportion so long as it was important to continue the organization and it conferred the benefits which were originally designed. This was a part of the contract which they solemnly obligated themselves to perform, and while they continued to enjoy its fruits and to reap the consideration expected, and they suffered no injury, there can be no cause of complaint.
It appears that the plaintiffs voluntarily paid the assess *254 ments due upon the Merritt property, thus making the full amount except the proportion now claimed of the defendants; and although not obligated to do so, I think this payment so far fulfilled and carried out the principle of assessment agreed upon, as to preserve the organization. Certainly the defendants were not injured by the payment of the share of the assessment, which the Merritt property was originally bound to contribute by the other associates, and under the circumstances, should not be permitted to avail themselves of the objection that it was illegal and unauthorized.
Second. I think the action was properly brought in its present form. By the concluding portion of the articles of association each of the associates severally bound himself to pay a ratable proportion of all expenditures for the improvements made and to be made. The undertaking was mutual. The covenants were with each other. All had an equal interest, and a refusal by one to pay made all the others interested in" enforcing it. The liability arises, I think, on the promise to each other, which can only be enforced by an action' among themselves. Those to whom it was made are the proper individuals to bring the action, hior was it essential that there should be a formal division of the interests of the associates into shares. The proportions were agreed upon by the associates, thus fixing the interest of each one and the shares which he or they represented. This was a sufficient allotment, within the articles of association.
I have examined the various objections made by the defendants to the admission of the different deeds introduced in evidence by the plaintiffs and the exceptions presented to the rulings of the Justice upon the trial in admitting evidence offered by the plaintiffs and in excluding testimony offered by the defendants. I am of the opinion that they were not well taken. Some of the points urged against the admissibility of the deeds in evidence are covered by the remarks already submitted in connection with other branches of the case, and I consider an extended discussion of these questions *255 in detail for this as well as other obvious reasons, unimportant and unnecessary.
It may also be observed that the exceptions taken to the decision of the Judge in refusing to dismiss the complaint, after the plaintiffs had rested their case, and in refusing to find as requested by the defendants, involve some of the same questions already discussed, and therefore do not require especial consideration.
The defendants in their answer claim that they are entitled to affirmative relief, and ask that the court order and adjudge that the award and determination of Marshall and others, to whom it was submitted to assess and apportion the expenses already'made, and' thereafter to be made, in proportion to the benefits received, shall be corrected, modified and so adjusted as to render that part of the expenses to be paid by the defendants proportionate to the advantage derived, and that they be allowed to withdraw from the association. I am at loss to determine how this court upon any well established principle can interfere with, or readjust the apportionment already made, or relieve the parties from the obligations which the award and their solemn agreement have imposed upon them. I have already discussed the question arising as to the unjust, oppressive and inequitable character of the assessment, and what has been said in that connection is mainly applicable to the point now under consideration. There is a class of cases where, as in a sale or conveyance, there is a mistake as to the quantity or subject matter of the thing contracted for, or where by accident or mistake the agreement is materially variant from what the parties intended, in which cases courts of equity will relieve against it. (Marvin v. Bennett, 8 Paige, 312. 26 Wend. 169. Calverley v. Williams, 1 Ves. Jr. 210. Gillespie v. Moon, 2 John. Ch. 585.)
I do not consider that this is a case within the principle laid down in the authorities above cited. Equity will not interfere to set aside a contract made in good faith, on the ground of mistake in judgment as to the value of the articles. *256 (Hunter v. Goudy, 1 Ham. 450.) Nor will it interfere where there was no fraud or misrepresentation, or surprise or mistake, except mistaken calculations and an unprofitable bargain. (Segur v. Tingley, 11 Conn. Rep. 134. Will. Eq. Juris. 72.)
The most which can be claimed by the defendants in the present case is,-that there was a mistaken calculation, and that by means of changes made by them in employing steam, in the place of the water power, they did not derive the advantages from the improvements of the association which they otherwise would have done. Conceding that the defendants have not needed and have not used more than half the water coming to them, in my opinion it does not relieve them from the obligations which they have assumed. It is enough that they have a right to enjoy the benefits conferred, and their voluntary abandonment of these furnishes no good ground for equitable relief. Nor do I think that the defendants can be allowed' to withdraw as members of the association. Although the defendants .have not of late enjoyed the full benefit of their improvements, and have refused to participate further in the transactions and business of the association, and have sought to abandon their connection with it, they can not be permitted thus to exonerate themselves from responsibility. If the court had the power to adjudge that they might in this way dissolve their relationship, and be discharged from further duties and obligations as members, it would be a question for grave consideration, exceedingly difficult to determine,- upon what terms and conditions such a withdrawal would be tolerated and allowed. It would be impossible, as a condition of withdrawal, to deprive them entirely of the use of the water power which had been largely increased and furnished them by the improvements made by the association, and utterly impracticable to restore the parties to the precise condition of affairs, and to the same equitable footing which they relatively occupied before the improvements were made by the association. The effect of any such with *257 drawal would inevitably impose additional burthens upon the remaining associates, while the defendants would continue to use and enjoy the privileges conferred, if not as much as formerly, yet to the extent which they desired. No .rules of compensation could well be provided and established for such a contingency. As the parties are situated, at the present time, I am not conscious of any just and fair mode by which the court can permit any of the members of the association to withdraw, and do even handed and exact justice and equity to all the parties. And although there may be some hardship in compelling the defendants to contribute, yet I think no case for the affirmative relief asked for by the defendants is made out, and no such relief authorized by the law.
[Albany General Term,
September 19, 1864.
I have carefully examined and considered, with that deliberation which the important questions involved in-the case at bar demands from the court, all the points taken and suggestions made in the learned and elaborate brief of the defendants’ counsel, and have not been able to discover any good ground for disturbing the decision of the trial court. The judgment must therefore be affirmed, with costs.
Peckhah, J. concurred in the result.
Hogeboom, J. expressed no opinion.
Judgment affirmed
Peckham, Hogeboom and Miller, Justices.]