## GRYMES *v.* SANDERS ET AL.

1. A mistake as to a matter of fact, to warrant relief in equity, must be material; and the fact must be such that it animated and controlled the conduct of the party. It must go to the essence of the object in view, and not be merely incidental. The court must be satisfied that but for the mistake the complainant would not have assumed the obligation from which he seeks to be relieved.

2. Mistake, to be available in equity, must not have arisen from negligence where the means of knowledge were easily accessible. The party complaining must have exercised at least the degree of diligence "which may be fairly expected from a reasonable person."

3. Where a party desires to rescind, upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be as conclusively bound by the contract, as if the mistake or fraud had not occurred. This applies peculiarly to speculative property, which is liable to large and constant fluctuations in value.

4. A court of equity is always reluctant to rescind, unless the parties can be put back *in statu quo.* If this cannot be done, it will give such relief only where the clearest and strongest equity imperatively demands it.

APPEAL from the Circuit Court of the United States for the Eastern District of Virginia.

The case was argued by *Mr. Conway Robinson* and *Mr. Leigh Robinson* for the appellant, and by *Mr. Edwin L. Stanton* and *Mr. George M. Dallas* for the appellees.

MR. JUSTICE SWAYNE delivered the opinion of the court.

The appellant was the defendant in the court below. The record discloses no ground for any imputation against him. It was not claimed in the discussion at the bar, nor is it insisted in the printed arguments submitted by the counsel for the appellees, that there was on his part any misrepresentation, intentional or otherwise, or any indirection whatsoever. Nor has it been alleged that there was any intentional misrepresentation or purpose to deceive on the part of others.

The case rests entirely upon the ground of mistake. The question presented for our determination is whether that mistake was of such a character, and attended with such circumstances, as entitle the appellees to the relief sought by their bill and decreed to them by the court below.

Peyton Grymes, the appellant, owned two tracts of land in Orange County, Va., lying about twenty-five miles from Orange court-house. The larger tract was regarded as valuable, on account of the gold supposed to be upon it. The two tracts were separated by intervening gold-bearing lands, which the appellant had sold to others. Catlett applied to him for authority to sell the two tracts, which the appellant still owned. It was given by parol; and the appellant agreed to give, as Catlett's compensation, all he could get for the property above $20,000. Catlett offered to sell to Lanagan. Lanagan was unable to spare the time to visit the property, but proposed to send Howel Fisher to examine it. This was assented to; and Catlett thereupon wrote to Peyton Grymes, Jr., the son of the appellant, to have a conveyance ready for Fisher and himself at the court-house upon their arrival. The conveyance was provided accordingly, and Peyton Grymes, Jr., drove them to the lands. They arrived after dark, and stayed all night at a house on the gold-bearing tract. Fisher insisted that he must be back at the court-house in time to take a designated train east the ensuing

day. This involved the necessity of an early start the next morning. It was arranged that Peyton Grymes, Jr., should have Peyton Hume, who lived near at hand, meet Fisher on the premises in the morning and show them to him, while Grymes got his team ready for their return to the court-house. Hume met Fisher accordingly, and showed him a place where there had been washing for surface-gold, and then took him to an abandoned shaft, which he supposed was on the premises. There Fisher examined the quartz and other *débris* lying about. But a very few minutes had elapsed when Grymes announced that his team was ready. The party immediately started back to the court-house. Arriving too late for the train, they drove to the house of the appellant: and Fisher remained there until one o'clock that night. While Fisher was there, considerable conversation occurred between him and the appellant in relation to the property; but it does not appear that any thing was said material to either party in this controversy. Fisher proceeded to Philadelphia, and reported favorably to Lanagan, and subsequently, at his request, to Repplier, who became a party to the negotiation. He represented to both of them that the abandoned shaft was upon the premises. Catlett went to Philadelphia, and there he sold the property to the appellees for $25,000. Fisher was sent to the court-house to investigate the title. He employed Mr. Williams, a legal gentleman living there, to assist him. A deed was prepared by Mr. Williams, and executed by the appellant on the 21st of March, 1866. On the 7th of April ensuing, the appellees paid over $12,500 of the purchase-money, and gave their bond to the appellant for the same amount, payable six months from date, with interest. The deed was placed in the hands of a depositary, to be held as an escrow until the bond should be paid. Catlett, under a power of attorney, received the first instalment, paid over to the appellant $10,000, and retained the residue on account of the compensation to which he was entitled under the contract between them. The vendees requested Hume to hold possession of the property for them until they should make some other arrangement. He occupied the premises until the following July, when, with their consent, he transferred the possession to Cordon. In that month, Lanagan and Repplier came to see

the property.  Hume was there washing for gold.  He began to do so with the permission of the appellant before the sale, and had continued the work without intermission.  The appellees desired to be shown the boundary-lines.  Hume said he did not know where they were, and referred them to Johnson. Johnson came.  The appellees desired to be taken to the shaft which had been shown to Fisher.  Johnson said it was not on the premises.  Hume thought it was.  Johnson was positive; and he was right.  The appellees seemed surprised, but said little on the subject.  They proceeded to examine the premises within the lines, and, before taking their departure, employed Gordon to explore the property for gold.  Subsequently this arrangement was abandoned, and they paid him for the time and money he had expended in getting ready for the work.  In September, they sent Bowman as their agent to make the exploration.  On his way, he stopped at the court-house, and told the appellant that the shaft shown to Fisher as on the land was not on it.  The appellant replied instantly, " that there was no shaft on the land he had sold to Repplier and Lanagan, and that he had never represented to any one that there was a shaft on the land, and that he had never authorized any one to make such a representation, nor did he know or have reason to believe that any such representation had, in fact, been made by any one." It does not appear that his attention had before been called to the subject, or that he was before advised that any mistake as to the shaft had occurred.  Bowman spent some days upon the land, and made a number of cuts, all of which were shallow.  The deepest was only fifteen feet in depth.  It was made under the direction of Embry and Johnson, two experienced miners living in the neighborhood.  It reached a vein of quartz, but penetrated only a little way into it.  They thought the prospect very encouraging, and urged that the cut should be made deeper.

Bowman declined to do any thing more, and left the premises. No further exploration was ever made.  Johnson says, " I know the land well, and know there has been gold found upon it, and a great deal of gold, too, — that is to say, surface-gold, — but it has never been worked for vein-gold.  The gold that I refer to was found by the defendant, Grymes, and those that

worked under him." He considered Bowman's examination
"imperfect and insufficient." He had had "twenty-three years'
experience in mining for gold."

Embry's testimony is to the same effect, both as to the sur-
face-gold and the character of the examination made by Bow-
man. The premises lie between the Melville and the Greenwood
Mines. Before the war, a bucket of ore, of from three to four
gallons, taken from the latter mine, yielded $2,400 of gold.
This, however, was exceptional. In the spring of 1869 a vein
was struck, from forty to fifty feet below the surface, yielding
$500 to the ton. Work was stopped by the influx of water.
It was to be resumed as soon as an engine, which was ordered,
should arrive. Ore at that depth, yielding from eight to ten
dollars a ton, will pay a profit. Embry says he is well ac-
quainted with the courses of the veins in the Melville and the
Greenwood Mines, and that "the Greenwood veins do pass
through the land in controversy, and some of the Melville
veins do also." Speaking of Bowman and his last cut, he
says : —

"At the place I showed him where to cut he struck a vein,
but just cut into the top of it; he did not go down through it,
or across it. From the appearance of the vein, I was very cer-
tain that he would find gold ore, if he would cut across it and
go deep into it, and I told him so at the time ; but he said that
they had sent for him to return home, and he couldn't stay
longer to make the examination, and went off, leaving the
cut as it was ; and the exploration to this day has never been
renewed. I am still satisfied, that, whenever a proper exami-
nation is made, gold, and a great deal of it, will be found in
that vein ; for it is the same vein which passes through the
Greenwood Mine, which was struck last spring, and yielded
$500 to the ton. His examination in other respects, as well as
this, was imperfect and insufficient. I don't think he did any
thing like making a proper exploration for gold. I don't think
he had more than three or four hands, and they were not
engaged more than eight or ten days at the utmost."

In September, 1866, Repplier instructed Catlett to advise
the appellant, that, by reason of the mistake as to the shaft, the
appellees demanded the return of the purchase-money which

had been paid. In the spring of 1867, Lanagan, upon the same ground, made the same demand in person. The appellant replied, that he had parted with the money. He promised to reflect on the subject, and address Lanagan by letter. He did write accordingly, but the appellees have not produced the letter. This bill was filed on the 21st of March, 1868.

A mistake as to a matter of fact, to warrant relief in equity, must be material, and the fact must be such that it animated and controlled the conduct of the party. It must go to the essence of the object in view, and not be merely incidental. The court must be satisfied, that but for the mistake the complainant would not have assumed the obligation from which he seeks to be relieved. Kerr on Mistake and Fraud, 408; *Trigg* v. *Read*, 5 Humph. 529; *Jennings* v. *Broughton*, 17 Beav. 541; *Thompson* v. *Jackson*, 3 Rand. 507; *Harrod's Heirs* v. *Cowan*, Hardin, 543; *Hill* v. *Bush*, 19 Barb. (Ark.) 522; *Jouzan* v. *Toulmin*, 9 Ala. 662.

Does the case in hand come within this category?

When Fisher made his examination at the shaft, it had been abandoned. This was *prima facie* proof that it was of no account. It does not appear that he thought of having an analysis made of any of the *débris* about it, nor that the *débris* indicated in any wise the presence of gold. He requested Hume to send him specimens from the shafts on the contiguous tracts, and it was done. No such request was made touching the shaft in question, and none were sent. It is neither alleged nor proved that there was a purpose at any time, on the part of the appellees, to work the shaft. The quartz found was certainly not more encouraging than that taken from the last cut made by Bowman under the advice of Embry and Johnson. This cut he refused to deepen, and abandoned. When Lanagan and Repplier were told by Johnson that the shaft was not on the premises, they said nothing about abandoning the contract, and nothing which manifested that they attached any particular consequence to the matter, and certainly nothing which indicated that they regarded the shaft as vital to the value of the property. They proceeded with their examination of the premises as if the discovery had not been made. On his way to Philadelphia, after this visit, Lanagan

saw and talked several times with Williams, who had prepared the deed. Williams says, " I cannot recollect all that was said in those conversations, but I do know that nothing was said about the shaft, and that he said nothing to produce the impression that he was dissatisfied or disappointed in any respect with the property after the examination that he had made of it." Lanagan's conversation with Houseworth was to the same effect.

The subsequent conduct of the appellees shows that the mistake had no effect upon their minds for a considerable period after its discovery, and then it seems to have been rather a pretext than a cause.

Mistake, to be available in equity, must not have arisen from negligence, where the means of knowledge were easily accessible. The party complaining must have exercised at least the degree of diligence " which may be fairly expected from a reasonable person." Kerr on Fraud and Mistake, 407.

Fisher, the agent of the appellees, who had the deed prepared, was within a few hours' travel of the land when the deed was executed. He knew the grantor had sold contiguous lands upon which veins of gold had been found, and that the course and direction of those veins were important to the premises in question. He could easily have taken measures to see and verify the boundary-lines on the ground. He did nothing of the kind. The appellees paid their money without even inquiring of any one professing to know where the lines were. The courses and distances specified in the deed show that a surveyor had been employed. Why was he not called upon? The appellants sat quietly in the dark, until the mistake was developed by the light of subsequent events. Full knowledge was within their reach all the time, from the beginning of the negotiation until the transaction was closed. It was their own fault that they did not avail themselves of it. In *Manser* v. *Davis*, 6 Ves. 678, the complainant, being desirous to become a freeholder in Essex, bought a house which he supposed to be in that county. It proved to be in Kent. He was compelled in equity to complete the purchase. The mistake there, as here, was the result of the want of

proper diligence. See also *Seton* v. *Slade*, 7 Ves. 269; 2 Kent's Com. 485; 1 Story's Eq., sects. 146, 147; *Atwood* v. *Small*, 6 Cl. & Fin. 338; *Jennings* v. *Broughton*, 17 Beav. 141; *Campbell* v. *Ingilby*, 1 De G. & J. 405; *Garrett* v. *Burleson*, 25 Tex. 44; *Warner* v. *Daniels et al.*, 1 Woodb. & M. 91; *Ferson* v. *Sanger*, id. 139; *Lamb* v. *Harris*, 8 Ga. 546; *Trigg* v. *Read*, 5 Humph. 529; *Haywood* v. *Cope*, 25 Beav. 143.

Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted. These remarks are peculiarly applicable to speculative property like that here in question, which is liable to large and constant fluctuations in value. *Thomas* v. *Bartow*, 48 N. Y. 200; *Flint* v. *Wood*, 9 Hare, 622; *Jennings* v. *Broughton*, 5 De G., M. & G. 139; *Lloyd* v. *Brewster*, 4 Paige, 537; *Saratoga & S. R. R. Co.* v. *Rowe*, 24 Wend. 74; *Minturn* v. *Main*, 3 Seld. 220; 7 Rob. Prac., c. 25, sect. 2, p. 432; *Campbell* v. *Fleming*, 1 Ad. & El. 41; Sugd. Vend. (14th ed.) 335; *Diman* v. *Providence, W. & B. R. R. Co.*, 5 R. I. 130.

A court of equity is always reluctant to rescind, unless the parties can be put back *in statu quo*. If this cannot be done, it will give such relief only where the clearest and strongest equity imperatively demands it. Here the appellant received the money paid on the contract in entire good faith. He parted with it before he was aware of the claim of the appellees, and cannot conveniently restore it. The imperfect and abortive exploration made by Bowman has injured the credit of the property. Times have since changed. There is less demand for such property, and it has fallen largely in market value. Under the circumstances, the loss ought not to be borne by the appellant. *Hunt* v. *Silk*, 5 East, 452; *Minturn* v. *Main*, 3 Seld. 227; *Okill* v. *Whittaker*, 2 Phill. 340; *Brisbane* v. *Davies*, 5 Taunt. 144; *Andrews* v. *Hancock*, 1 Brod. &

B. 37; *Skyring* v. *Greenwood*, 4 Barn. & C. 289; *Jennings* v. *Broughton*, 5 De G., M. & G. 139.

The parties, in dealing with the property in question, stood upon a footing of equality. They judged and acted respectively for themselves. The contract was deliberately entered into on both sides. The appellant guaranteed the title, and nothing more. The appellees assumed the payment of the purchase-money. They assumed no other liability. There was neither obligation nor liability on either side, beyond what was expressly stipulated. If the property had proved unexpectedly to be of inestimable value, the appellant could have no further or other claim. If entirely worthless, the appellees assumed the risk, and must take the consequences. *Segur* v. *Tingley*, 11 Conn. 142; *Haywood* v. *Cope*, 25 Beav. 140; *Jennings* v. *Broughton*, 17 id. 232; *Atwood* v. *Small*, 6 Cl. & Fin. 497.; *Marvin* v. *Bennett*, 8 Paige, 321; *Thomas* v. *Bartow*, 48 N. Y. 198; *Hunter* v. *Goudy*, 1 Ham. 451; *Halls* v. *Thompson*, 1 Sm. & M. 481.

The bill, we have shown, cannot be maintained.

In our examination of the case, we have assumed that those who are alleged to have spoken to the agent of the appellees upon the subject of the shaft, before the sale, had the requisite authority from the appellant.

Considering this to be as claimed by the appellees, our views are as we have expressed them. We have not, therefore, found it necessary to consider the question of such authority; and hence have said nothing upon that subject, and nothing as to the aspect the case would present if that question were resolved in the negative.

*Decree reversed, and case remanded with directions to dismiss the bill.*