### RICHARDSON *v.* WALTON *et al.*

*(Circuit Court, D. Delaware. January 28, 1892.)*

**1. CANCELLATION OF CONTRACT—FRAUD—EVIDENCE.**

A bill to set aside a contract dissolving a partnership alleged that, while plaintiff was confined to his house by illness, his two copartners insisted upon a settlement, and as a basis therefor presented a statement, in which the year's profits were estimated at $50,000. The actual profits were over $100,000; and plaintiff's bookkeeper testified that before the settlement he had made a statement, on request of one of the defendants, showing profits of about that amount. It appeared, however, that shortly after the settlement he made a statement showing profits of $60,-000, and defendants both testified that the statement showing $100,000 profits was made at a still later date; that no statement was made before the settlement, and that the estimate was *bona fide. Held,* that the charge of fraud was not made out.

**2 SAME—FALSE STATEMENTS NOT RELIED ON.**

Plaintiff possessed an intimate knowledge of the firm's affairs, and testified that when the estimate was presented he felt satisfied that it was much too low, but that he accepted it because of his critical physical condition, and upon the advice of his physician to give up business. *Held,* that, even if the estimate was knowingly false, he was entitled to no relief, as he was not in fact deceived.

**3. SAME—MISCONDUCT OF PLAINTIFF.**

Where a partner raised money on the firm paper to purchase a rival concern for his own benefit, enticed away valued employes, and, under threats of liquidation

by legal proceedings, sought to enforce a sale to himself, he has no equity which will support a bill to set aside a contract of dissolution, made at the instance of his copartners upon discovering his wrongful use of the firm's credit.

4. SAME—LACHES.

Where a bill to set aside an alleged fraudulent contract states that the facts concerning the fraud were communicated to the plaintiff nearly three years prior thereto, and it appears that in the mean time, at intervals of every three months, he had accepted payment on a series of notes given under the contract, the delay is fatal to his right to equitable relief.

In Equity.

*Anthony Higgins* and *S. S. Hollingsworth*, for complainant.

*George Gray* and *Benjamin Nields*, for defendants.

ACHESON, Circuit Judge. In the year 1869 the plaintiff, Charles Richardson, and the defendants, Ephraim T. Walton and Francis N. Buck, entered into copartnership in the business of manufacturing superphosphate at Wilmington, Del., under the firm name of Walton, Whann & Co. By their written agreement the term of the partnership was limited to five years, but, without any formal or express renewal or extension thereof, they continued in the business until July 13, 1885, when they executed articles of dissolution, whereby the plaintiff sold and agreed to convey to the defendants all his interest in the partnership business and property (except in certain scheduled claims and accounts) for the sum or price of $123,436.74, payable as follows: $23,436.74 in cash; $60,000 in the defendants' 12 promissory notes, all dated July 6, 1885, each for $5,000, and payable, with interest, the first in three months, and the others respectively at the end of each consecutive three months thereafter; and the balance or sum of $40,000 on July 6, 1890, with interest, payable semi-annually, secured by a bond and mortgage upon real estate. Accordingly the defendants, about the date of the articles of dissolution, paid and delivered to the plaintiff the hand-money and the specified securities, and he executed a conveyance to them. The defendants paid all their promissory notes as they matured, and also the semi-annual interest installments upon the mortgage, down to the filing of the bill in this case, on October 12, 1888.

The substantial purpose of the bill is to put a valuation upon the firm assets beyond the accepted value in the settlement, and to compel the defendants to pay the plaintiff a larger sum for his interest in the firm than the agreed price. The first and principal prayer is as follows:

"(1) That the said articles of dissolution be declared to have been procured by fraud and duress, and that the same be reformed in accordance with the real value of the firm's assets at the time of said dissolution."

The bill charges in substance that in the month of June, 1885, while the plaintiff was ill, and confined to his house, unable personally to attend to business, and at a time when he was "threatened with financial ruin if he was unable to arrange for meeting" commercial paper on which he was indorser, the defendants pressed upon him the dissolution of the copartnership; that in the negotiations which followed between the plaintiff, acting through his counsel, W. C. Spruance, Esq., and the defend-

ants, the latter presented a statement in writing as a bāsis for settlement, which showed the "estimated profits for current year" to be $50,000, and the value of the plaintiff's interest in the firm to be $123,436.74. The next two paragraphs of the bill we think it best to quote at length:

"(13) That, while your orator believed that the basis of settlement, the original of which is in the handwriting of the respondent Buck, was incorrect, and that your orator's share of the business, instead of being worth a little more than $123,000, was worth many thousand dollars more, yet your orator, in entering into the articles of dissolution hereafter referred to, relied on the correctness of the estimate of profits, and the correctness of the balance-sheet of July 1, 1884, which was taken as the basis for the estimate upon which the articles of dissolution were based; and moreover, your orator's physician assured him that his only chance of life was an absolute rest, and that any sudden shock might result in instant death. That under these circumstances your orator agreed to this settlement, and executed the articles of dissolution, a copy of which is hereto annexed as part hereof. (14) That your orator is informed and believes, and avers that the respondents knew, as early as the 16th of June, 1885, that the books showed that the estimate of profits to July 1, 1885, should be at least double the figures stated by them, viz., $50,000, in the basis of settlement; that he believes and avers that they knew that the alleged depreciation in the value of the real estate, to-wit, $103,-000, was more than the real depreciation."

The next (15) paragraph charges that the balance-sheet of 1884, which which was used to show what credit the plaintiff was entitled to on July 1, 1884, was a false balance-sheet, and known to the defendants to be so. But neither this charge, nor the one relating to the matter of depreciation in the real estate, was seriously pressed at the argument; and certainly the evidence does not sustain either of these charges. We therefore dismiss them without further comment.

The charge deserving serious consideration under the proofs is the one relating to the defendants' alleged knowledge, acquired as early as June 16, 1885, as to what the profits for the then current business year were, and the withholding of that information from the plaintiff, whereby he was deceived and injured. This charge rests mainly, and, so far as direct evidence goes, exclusively, upon the testimony of William M. Francis, who was the accountant of the firm. He testifies that on June 11, 1885, he was asked by the defendant Buck to make up a statement showing the profits for the year ending July 1st, and that he did so, and on June 16th handed to Buck the statement, which showed the profits to be about $100,000. On the other hand, Buck denies that he made such request, and he testifies that no statement of profits was furnished him by Francis on June 16th, or at any time until in the month of July after the execution of the articles of dissolution; and that he acted in the settlement with the plaintiff without any specific information or certain knowledge as to what the profits were or would prove to be when the books should be settled up after the close of the year's business; and that he would have sold his interest upon the estimate of profits which entered into the settlement. Walton testifies to the like effect. To determine the weight to which the evidence on this point is fairly entitled and the effect to be given to it, it is necessary to advert to certain facts

and circumstances which led up to the dissolution of the copartnership, and were closely connected, in point of time and otherwise, with the transaction. But we will not particularly refer to the voluminous proofs touching partnership affairs, and some differences between the partners of earlier and remote dates, for we do not regard those matters as materially affecting the issue. It is shown that in the month of March, 1885, without informing his copartners, the defendants, of his intention so to do, the plaintiff purchased on his own private account the capital stock of the Wando Phosphate Company, whose works were located at Charleston, S. C.,—a company engaged in the same business as Walton, Whann & Co., and supplying fertilizers to the same region of country. Those works, if owned by Walton, Whann & Co., and operated in conjunction with the Wilmington works, would have been a great advantage to the firm; but, owned by the plaintiff, and run on his individual account, the Wando works—especially by reason of their nearness to the southern customers of the firm—were likely to come into dangerous rivalry with the firm. It appears that by letter dated Philadelphia, March 21, 1885; and addressed to William M. Francis, who was then at Macon, Ga., upon business of Walton, Whann & Co., the plaintiff advised Francis of his Wando purchase; stated that he would be in Charleston on the 25th of the month, and invited Francis to join him there, "to have a talk with me about future business, from Charleston." The letter thus ends: "All the above is in the strictest confidence. W., W. & Co. as yet know nothing of it." On April 7, 1885, the plaintiff wrote to Francis for immediate information as to the amount of the season's sales by Walton, Whann & Co. at their Macon office; and at the foot of the letter we find this injunction: "Let this be confidential." There is evidence that this confidential correspondence between the plaintiff and Francis was kept up through most of the month of April. Before his purchase of the Wando stock, the plaintiff took into his confidence in respect thereto George A. Le Maistre, the superintendent of the manufacturing department of Walton, Whann & Co., and Albanis L. Anderson, their general manager at Baltimore, and supervisor of sales of their products over a large portion of the southern country; and it is indisputably shown that the plaintiff had a secret arrangement—although, perhaps, not yet entirely definite in all details—with these two persons, who were old and invaluable employes of Walton, Whann & Co., that they should go into the service of the Wando company, and have an interest therein. Under date of March 23, 1885, the plaintiff wrote a letter to Le Maistre in which these expressions occur:

"I see my way clear to get on in my opening to W. and B. without a row. My reason for withdrawing my individual paper, etc., will be enough to urge to them for cutting down business, etc. I shall report the Wando purchase. Shall not name you or Anderson in connection with it. * * * I feel confident (reasonably so) that my plan for handling them is a good one."

Writing to Anderson under date of March 31st, the plaintiff, after mentioning the absence of the defendants upon the occasion of his visit to Wilmington that day, added:

"All this was very fortunate for me, as I had no interference in getting the figures that I wanted, which I did to my satisfaction. * * * I expect to make my figures to-morrow, and to make my proposition to them before the end of the week."

Le Maistre and Anderson testify that it was part of the plaintiff's plan, as disclosed by him to them, to acquire the interest of the defendants in Walton, Whann & Co., and to run the two concerns under one management; but, if he could not buy from the defendants, then to put the Wilmington concern into the hands of a receiver, and the firm into liquidation. There is abundant corroborative and convincing evidence that the plaintiff had determined upon that line of action. In the course of his testimony he himself states: "I was advised that the partnership was a partnership at will, and I had a right to put it into liquidation on any day I chose." George W. Bush testifies that about the last of March, 1885, in an interview with him, the plaintiff said "he was going to buy out the business of Walton, Whann & Co.; that he had secured the services of the superintendent, the sales-agent, and the book-keeper; and that he expected to buy the business of Walton, Whann & Co.,—buy out the concern. * * * He said he would compel them to sell, or that he would apply for a receiver." S. F. Osborn, who was a traveling salesman of the firm, testifies that in March or April, 1885, the plaintiff told him that he was going to buy out Walton and Buck, and in reply to the remark of the witness that he hoped he would have no difficulty, the plaintiff replied "he had them in such a position that they could not do anything; they would have to accede to his terms." Several other witnesses testify that the plaintiff, about the same time, made the like statements to them. On April 2d the plaintiff met the defendants, told them of his purchase of the Wando works, and insisted upon the dissolution of the firm of Walton, Whann & Co. The plaintiff states that he suggested either that the defendants should buy him out, or that he should purchase their interests; but this the defendants deny, and they say that the alternative he presented was a sale of their interests to him or liquidation.

It is proved that in the year 1885 the plaintiff, without the consent or knowledge of the defendants, or either of them, had had discounted, or had used for his own personal benefit, a large amount of commercial paper of the firm,—notes made by the firm, and notes of their sales-agents to the order of the firm, and indorsed with the firm name by the plaintiff,—aggregating more than $100,000. The plaintiff alleges that at no one time had he so in use an amount of firm paper in excess of the surplus he had in the firm beyond the capital he was bound to keep therein. This is controverted, and we are not satisfied that the plaintiff's allegation is correct. But, however this may be, the more important fact appears that in his purchase of the Wando stock, which cost $116,000, the plaintiff used $22,000 raised by the discount of notes of Walton, Whann & Co., and on a pledge of the stock itself raised $85,-000. The first intimation the defendants had that the plaintiff had made an unauthorized use of firm paper for his own private ends came

to them on April 6, 1885, in a telegram from the National Bank of the Republic at Philadelphia, announcing a want of funds to meet a note for $5,000, bearing the firm's indorsement. The plaintiff had overlooked the date of the maturity of this note, and thus had failed to make timely provision for it. On June 3d the plaintiff furnished to the defendants, in response to their demand, a list of notes so used by him; but the defendants testify that they soon discovered that the list was incomplete. On June 6th Walton made a formal demand on the plaintiff that he turn over to the firm the Wando stock. About this time the plaintiff took sick. His symptoms were alarming, and he was confined to his house for some weeks. But his mental faculties were in full vigor always, and he was keenly alive to his own pecuniary interests. It should here be stated that the plaintiff had taken an active part in the business of the firm, and his general knowledge of its affairs was not less than that of his copartners. Moreover, there is proof that he had recently sought and acquired particular information touching the condition of the firm and the value of its assets. On June 16th the defendants addressed a letter to the plaintiff, in which they said:

"Because of transactions of yours in violation of the proper relations which should exist between partners in business, a knowledge of which, as you are aware, has but lately been brought to our notice, we have determined to bring to an end our present copartnership relations."

—And to that end they requested an interview. No such personal interview took place, but in all the subsequent negotiations the plaintiff had the advice and active assistance of able, experienced, and vigilant counsel.

In the first proposition of purchase made by the defendants the profits for the current business year were estimated at $42,000, which was the plaintiff's own estimate in April; but in the course of the further negotiations the estimate of profits was raised to $50,000, the estimated depreciation in the real estate was increased, and the defendants finally abandoned their claim to the Wando stock, to which theretofore they had tenaciously adhered. These terms were all eventually agreed on and incorporated in the articles of dissolution. It is proper here to mention that for several months succeeding the dissolution Mr. Francis remained with the defendants, but left them in November, 1885, and then went into the service of the Wando Phosphate Company, in whose employ he has remained. It is stated in the bill of complaint that in November, 1885, Mr. Francis communicated to the plaintiff that "the estimate of profits made the basis of the articles of dissolution was false, and that the respondents knew it was false at the time they presented it." As has been already intimated, as respects the alleged fraudulent conduct of the defendants in secretly acquiring information concerning the year's profits which they suppressed in their dealings with the plaintiff, the only direct evidence is that of Mr. Francis on the one hand and that of the two defendants on the other. This testimony is flatly contradictory. The plaintiff with confidence relies, as corroborative of the testimony of Francis, upon certain letters, calling for immediate and

special information, dated June 11, 1885, written by Francis himself, but signed with the firm name by Buck, addressed to the branch offices of the firm at Baltimore, Jacksonville, Fla., and Macon, Ga. The defendants' explanation of the occasion of these letters is that they were in a state of great alarm when they learned the large amount of the outstanding unauthorized issue of firm paper, and were anxious to know speedily what the amount of the firm's quick assets was, and that they set Francis at work to ascertain this, and not to make up a statement of profits for the current business year. They both testify positively that the first statement of profits that Francis exhibited to them showed the profits to be $60,375.98, and that this was made up after the dissolution agreement was executed. They produce, as confirmatory of their testimony, this paper, which confessedly is in Mr. Francis' handwriting, and was made by him about the middle of July. There is also in evidence another statement in the handwriting of Francis, and made by him a few days after the one just mentioned, which shows the profits to be $101,277.91, which figures are correct. These two papers, the plaintiff insists, are only apparently and not really discrepant, the differences (as is alleged) being merely a matter of book-keeping, as one or other of two methods of making closing entries is adopted. But, if this be so, the weighty fact yet remains that about the middle of July Mr. Francis made up a statement which plainly showed, and to the common apprehension would be understood as meaning, that the year's profits were $60,375.98 only, and both defendants swear that that was the first statement of profits he exhibited to them. Furthermore, the testimony of Mr. Bailey, who was an assistant to Mr. Francis in June, 1885, as to the then unposted state of the reports from the branch offices, and as to what Francis was then engaged at, etc., taken in connection with the two July statements, tends at least to excite doubt as to the accuracy of Mr. Francis' recollection as to the time when he made up his first statement of profits. The burden of proof is upon the plaintiff. The bill charges fraud, and a reformation of the articles of dissolution is sought. To entitle the plaintiff to relief the proofs should be free from all doubt, and convincing. But they do not appear so to be to us. Taking the proofs as a whole, this much can be safely said: that the evidence is not so clear and satisfactory as to justify a decree sustaining the charge.

But, if a different conclusion upon the facts were admissible, still, in our judgment, the plaintiff would not be entitled to the relief he seeks, for several reasons. In the first place, his secret purchase, on his own account, of competitive works; his unauthorized use of the notes of Walton, Whann & Co. in effecting the purchase; his underhand arrangement with old and valued employes of the firm, whereby their services were to be withdrawn from the firm and transferred to his rival establishment; and—having thus acquired these advantages—his attempt to coerce his copartners into selling their interests to him under threat of liquidation by legal proceedings,—were acts so faithless and unfair to the defendants as to deprive the plaintiff of any standing in a court of

equity in this controversy. It is here notable that the plaintiff does not even now offer to make reparation by bringing into the settlement the Wando stock, or propose to open the question of right thereto, but, holding on to all the benefits he has already derived from the settlement, he asks that the accepted estimate of profits be raised to augment the value of his interest.

Again, as we have seen, the plaintiff in his bill states that when he entered into the settlement he believed that its basis was incorrect, and that his interest in the firm was "worth many thousand dollars more." But his own testimony goes far beyond this admission. Being under examination in chief in his own behalf, he testified thus:

"*Question.* Was your familiarity with the value of the assets of the firm at this time sufficient to enable you to judge of the accuracy of this statement? *Answer.* Oh, yes. *Q.* How accurate was it? *A.* I was satisfied that it was in round numbers $80,000 less to me than it should be, although I knew it was possible it might be $25,000 more than that short of what it should be."

He then proceeded to particularize wherein he then judged the statement to be erroneous, namely, in "the deductions on real estate, guaranty of current sales, the estimate of profits for the year, and the deduction for doubtful accounts." Being asked why he accepted the basis of settlement if he felt it gave him $80,000 less than he was entitled to, he answered that it was because of his critical physical condition, and the advice of his physician to give up business. It is then perfectly clear that the plaintiff did not rely upon the correctness of the basis of settlement presented to him. Taking him at his own word, he was not deceived at all. He had sufficient knowledge of the real value of his interest in the firm, and the alleged fraudulent statement of profits was not the determining cause of his entering into the settlement. Upon what principle, then, can the plaintiff be relieved from the consequences of his deliberate act? The party complaining of misrepresentation must have been ignorant of the true state of facts, and must have given credit to the misrepresentation, and have been actually misled thereby to his hurt. 1 Bigelow, Frauds, 521; *Slaughter's Adm'r* v. *Gerson,* 13 Wall. 379. The motive which the plaintiff states induced him to make a settlement involving a known pecuniary loss, not having arisen out of anything for which the defendants are responsible, can afford no ground for avoiding the settlement.

But finally, the bill of complaint states that as early as November, 1885, Francis communicated to the plaintiff not only that the estimate of profits which was the basis of settlement was false, but that the defendants knew it was false at the time they presented it. Yet the bill was not filed until October 12, 1888. Nothing has been shown to excuse this delay. During this long period the plaintiff uttered no word of complaint, gave no sign of dissatisfaction. Without challenging the settlement he went on accepting under it, at the end of each consecutive three months, $5,000, until all the 12 promissory notes given by the defendants were paid. By this acquiescence after full knowledge —by thus receiving and enjoying the fruits of the contract—the plain-

tiff has precluded himself from equitable relief. Kerr, Frauds, 301.
If he meant to rescind or reform the settlement upon the ground of fraud
he was bound to move promptly, and his delay of nearly three years
was fatal. *Grymes* v. *Sanders*, 93 U. S. 62; *Societe Fonciere* v. *Milliken*,
135 U. S. 304, 10 Sup. Ct. Rep. 823. It has been repeatedly declared
that there must be conscience, good faith, and reasonable diligence to
call into action the powers of a court of equity. *McKnight* v. *Taylor*, 1
How. 161; *Creath's Adm'r* v. *Sims*, 5 How, 192. But these things are
lacking in the plaintiff's case. It follows, then, from what has been
said, that, so far as concerns the main issue,—the one we have dis-
cussed,—the bill of complaint must be dismissed, with costs to the de-
fendants.

The articles of dissolution provide that the defendants shall collect the
scheduled claims, etc., excepted out of the contract of sale, and from
time to time, on request, account to the plaintiff for his share; and the
bill charges failure and refusal by the defendants to do so. The answer
denies this allegation, but admits that there is a balance of $699.30 in
their hands belonging to the plaintiff, which they are willing and ready
to pay over to him. This part of the case rests upon the bill and an-
swer. We have had some doubt whether we should dismiss the whole
bill without prejudice to the plaintiff's right to sue at law for the amount
coming to him out of these claims, or retain the bill with a view to a
decree that shall cover every matter in dispute. But we have at length
concluded to pursue the latter course. Perhaps the parties can agree
upon the balance due to the plaintiff from these collections. But if
they cannot do so, we will appoint a master to ascertain the amount, re-
serving the question of the costs of the reference until the coming in of
his report.

WALES, District Judge, concurs.